IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,             )
                               )
v.                             )      No. 3:12-CR-18
                               )
DANIEL EDWARD LOPEZ,           )      (PHILLIPS/GUYTON)
                               )
        Defendant.             )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court

as may be appropriate. This case is before the Court on the Defendant's Motion to Suppress as

Evidence the Contents of a Box Seized and Searched on February 7, 2012 [Doc. 15] and the Motion

to Suppress All Evidence Obtained as a Result of the Search of the Defendant's Residence and a

Black 2003 Nissan Sentra on February 3, 2012 [Doc. 16], both filed on March 28, 2012. The

Government responded [Docs. 19 and 20] in opposition to both motions on May 1, 2012. The Court

held an evidentiary hearing on June 1, 2012. Assistant United States Attorney Kelly Ann Norris

represented the Government. Attorney Jonathan A. Moffatt appeared on behalf of the Defendant,

who was also present. The Government presented the testimony of Knoxville Police Department

("KPD") Investigators Michael Spence, Glen Morrell, and Andrew Boatman, as well as the

testimony of Agent David Bukowski of the Federal Bureau of Investigation ("FBI"), KPD/FBI Task

Force Investigator Todd Gilreath, and FBI Agents Paul Hughes and Clay Anderson. The Defendant

presented the testimony of Ashley Lasley and Gary Lopez. At the conclusion of the hearing, the

Court granted the Defendant's request for leave to file a post-hearing brief. The Defendant filed his post-hearing brief [Doc. 24] on June 29, 2012. The Government filed its responsive post-hearing brief [Doc. 25] on July 17, 2012, with the Defendant filing a reply brief [Doc. 26] on July 18, 2012. The Court took the motion, response, testimony, exhibits, and post-hearing briefs under advisement on July 19, 2012.

## I. POSITIONS OF THE PARTIES

The Defendant is charged in a four-count Indictment [Doc. 7] with two counts of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d), and two counts of brandishing a firearm during those alleged bank robberies in violation of 18 U.S.C. § 924(c). The bank robbery charged in Count One is alleged to have occurred on or about December 13, 2011, at the Oak Ridge National Laboratory Federal Credit Union in Knoxville, Tennessee. The bank robbery charged in Count Three is alleged to have occurred on or about February 1, 2012, at the Enrichment Federal Credit Union, also in Knoxville, Tennessee.

In his first motion [Doc. 16], the Defendant argues that the evidence obtained as a result of the searches of his apartment and the black Nissan Sentra should be suppressed because the searches were conducted in violation of his Fourth Amendment rights. He contends that he was illegally seized and detained in the parking lot, he did not consent to the searches, and his girlfriend did not knowingly and voluntarily consent to the search of his apartment. The Government responds [Doc. 20] that reasonable suspicion existed to detain the Defendant and that the Defendant's girlfriend had authority to consent to the search of both the car and the apartment and properly did so.

In his post-hearing brief [Doc. 24], the Defendant again asserts that law enforcement detained

2

him in the parking lot specifically so that he could not be near the apartment when they obtained consent to search from his girlfriend, rather than because they had reasonable suspicion to detain him. He also claims that the Defendant's girlfriend acquiesced and felt intimidated into signing the consent to search forms and that she did not give valid consent. The Government [Doc. 25] reiterates the factors contributing to the reasonable suspicion possessed by the officers, emphasizes the Defendant's live-in girlfriend's authority to consent to the searches and asserts that she gave valid consent, and argues that the Defendant did not object to either the search of the vehicle or the apartment.

In his next motion [Doc. 15], the Defendant asserts that he had a legitimate expectation of privacy in a closed box seized from his father's garage on February 7, 2012, and that the search of the box violated his Fourth Amendment rights. He argues that his father did not consent to the search of the box when he consented to the search of the garage generally, because his father specified that he was consenting only to the search of items belonging to him. Thus, the Defendant argues that law enforcement needed a search warrant to open the box at issue. The Government responds [Doc. 19] that the Defendant lacked a reasonable expectation of privacy in the box as it was unsealed and not concealed in his father's garage and that the Defendant's father had apparent authority to consent to the search of the box in his garage. In his post-hearing brief [Doc. 24], the Defendant additionally argues that his father did not have actual authority to consent to the search of the box as he did not have joint access, control, or mutual use of the box. The Defendant also contends that his father lacked apparent authority to consent to the search because law enforcement was aware that the box belonged to the Defendant and that his father did not know the contents of the box.

The Government [Doc. 25] asserts that it was reasonable for the officers to believe the Defendant's father had authority to consent to a search of the Defendant's boxes. It contends that the Defendant's father's consent to search the garage would reasonably have been understood to extend to the relevant box and that the officers were not required to obtain special consent for the box specifically. Finally, the Government argues that the officers acted in good faith and that no deterrent effect would be gained through the suppression of the evidence, leading to a conclusion that the exclusionary rule should not be applied here.

## II. SUMMARY OF EVIDENCE FROM SUPPRESSION HEARING

### (A) Testimony of Investigator Michael Spence

The Government called Investigator Michael Spence, who testified that he works as an Investigator with the Organized Crime Unit of the KPD, investigating narcotics and other crimes and assisting with surveillance. Investigator Spence became involved in the investigation of the Defendant when he and Investigator Glen Morrell received a telephone call from Investigator Todd Gilreath, requesting that they come and assist with surveillance. After receiving the call, Spence and Morrell, riding together, met up with Investigator Gilreath and were shown a small black car in a parking lot off of Clinton Highway in Knoxville, Tennessee. When Spence and Morrell arrived in the parking lot, the black car was stopped, and when it started to move, the investigators followed the car to the Meadowood Apartments, where they ceased their surveillance. Spence and Morrell did not follow the car into the apartment complex and allowed another officer to follow the car, because they did not want the occupants of the car to realize that they were following them.

Spence and Morrell then went to a Weigel's service station near the Meadowood Apartments.

4

After some time, the investigators were called back to the apartment complex to meet investigators and special agents who were with the Defendant near the tennis courts. When Spence and Morrell arrived, other law enforcement officers were already talking to the Defendant, and Spence and Morrell stood at a distance to ensure safety. Spence related that when he and Morrell first arrived, Agent Paul Hughes was talking to the Defendant. Afterward, Special Agent Clay Anderson talked to the Defendant for "quite some[ ]time." [Doc. 23 at 9]. Investigator Spence stated that no one affirmatively asked the Defendant any questions after Hughes walked away. After Hughes left, Investigators Spence and Morrell and Special Agent Anderson stayed with the Defendant in the parking lot while the other officers and agents were doing other things in the apartment complex. Anderson talked to the Defendant the most, while Spence and Morrell "were just there watching, just to watch officer safety and make sure he didn't run off, stuff like that." [Doc. 23 at 10]. The Defendant was not handcuffed at that point.

Spence overheard parts of Anderson's conversation with the Defendant and believes that he mainly overheard small talk about the military and where the Defendant was from. Spence did not hear the entire conversation because he was speaking with other investigators during the time. Spence related that the Defendant made a telephone call on his cellular telephone during this time and was allowed to smoke a cigarette. Spence believes that the Defendant called a family friend, who is an attorney.

Spence testified that no one yelled at the Defendant or pointed their firearms at him. Spence stated that the Defendant did not say that no one was allowed to search the Nissan Sentra or that no one could search his apartment. Some time later, after they had been standing with the Defendant in the parking lot for approximately thirty minutes, the Defendant was placed under arrest,

5

handcuffed by Special Agent Hughes, and put into Hughes's vehicle. When the Defendant was arrested and put in the car, the attorney family friend had arrived and was permitted to speak with the Defendant in the backseat of the car. Hughes then transported the Defendant away from the apartment complex.

On cross-examination, Spence testified that he did not work on the investigation of the bank robberies, which occurred on December 13, 2011, and February 1, 2012, prior to Investigator Gilreath showing him the car on which he was to conduct surveillance. Gilreath showed Spence and Morrell surveillance photographs of the car used in the February robbery and told them that the car in the parking lot was the one believed to be in the photographs.

Spence testified that the Defendant was not free to leave while he remained in the parking lot with Spence, Morrell, and Anderson. Spence testified that he was present to make sure that the Defendant did not leave, and he stated that he heard Hughes inform the Defendant that he was not free to leave. Spence reiterated that he and Morrell stayed back a bit and only heard portions of Special Agent Anderson's conversation with the Defendant. Spence clarified that he never heard the Defendant mention anything related to consenting to the search of his apartment, and he conceded that the Defendant could have done so without him hearing. Spence again stated that he only heard the beginning portion of the Defendant's conversation with Anderson and that he does not know what all was said during the conversation, which lasted for some length of time.

On redirect examination, Investigator Spence repeated that he never heard the Defendant state that no one could search his apartment. On re-cross-examination, Spence again stated that he did not hear the entire conversation between the Defendant and Special Agent Anderson.

*(B) Testimony of Investigator Glen Morrell*

6

Investigator Glen Morrell is also a KPD investigator with the Organized Crime Unit, investigating narcotics and other major crimes. Investigator Morrell related that he first became involved in the investigation of the Defendant when he and Spence received a call from Investigator Gilreath on February 3, 2012, informing them that "he had seen a suspect vehicle from one of his bank robberies on Clinton Highway and needed assistance." [Doc. 23 at 21]. Morrell and Spence then went to meet Investigator Gilreath at the Food City grocery store shopping center on Clinton Highway, in Knoxville. At the hearing, Morrell, as an occupant of the same car as Spence, described the events that followed, the surveillance and contact with the Defendant, consistently with Spence's testimony about the events. [Doc. 23 at 21-29].

As stated by Spence, Morrell affirmed that their role in standing with the Defendant at that point was to make sure he did not leave the area and that the Defendant spoke mostly with Anderson. Like Spence, Morrell heard some small talk, which occurred between Anderson and the Defendant, but he did not hear the two discuss the alleged robbery or anything related to the Defendant's case. Morrell testified that the Defendant never stated that law enforcement was not allowed to search his apartment while Morrell was around him.

After the Defendant was arrested and transported from the scene, Morrell moved to the apartment and assisted in the search of the upstairs office area of the apartment. Morrell believes that he was aware that law enforcement had obtained signed consent to search the apartment before he entered.

On cross-examination, Morrell stated that Gilreath told him and Spence that he had located one of the cars of a bank robbery suspect when they came to conduct surveillance. Gilreath did not tell Morrell about the bank robbery or the type of car reportedly used in it but did tell him which car

he was watching.

Morrell reiterated that he did not hear the whole length of the conversation between the Defendant and Anderson, because he was moving around approximately ten to twenty feet from the Defendant. Morrell again stated that his role was to keep the Defendant there, and he related that he considered the FBI agents who were investigating the bank robbery to be in charge on the scene.

On redirect examination, Morrell clarified that when he and Spence were making sure the Defendant did not leave the parking lot, they allowed approximately two parking spaces for him to walk around, while the investigators remained on the perimeter.

*(C) Testimony of Sergeant Andrew Boatman*

Sergeant Andrew Boatman testified that he works for KPD and that he serves as Supervisor of the Organized Crime Unit, overseeing the unit's participation in the Federal Task Force Program. Sergeant Boatman has fifteen investigators under his command, and he operates the Seizure and Forfeiture Asset Program and manages the Drug Fund. Boatman first became involved with the investigation of the Defendant on February 3, 2012, when TFO Gilreath, who is in his unit assigned to the Safe Streets Task Force of the FBI, called on his cellular telephone and informed him that Gilreath was conducting surveillance on a potential bank robbery suspect near Clinton Highway. As he told Spence and Morrell, Gilreath told Boatman that he had spotted a car that he believed was the suspect vehicle and that he needed surveillance assistance.

After receiving the call from Gilreath, Boatman left his downtown Knoxville office and drove toward the Food City parking lot on Clinton Highway. While Boatman was en route, he learned that "[t]he surveillance went mobile," so he communicated by radio and telephone with Gilreath and "fell into position to pick up surveillance" when "[t]hey relayed their location." [Doc.

8

23 at 35]. When Boatman saw the dark Nissan Sentra turn into the Meadowood Apartments at 4000 Pleasant Ridge Road, he turned in and followed the car into the apartment complex. Boatman parked some distance from the Sentra in the parking lot so that he could continue to watch it.

Boatman observed a white male and white female, who had already exited the Sentra, together with another white male, go back and forth from a minivan parked next to the Sentra with its tailgate open to the back patio area of an apartment. Gilreath had informed Boatman that the bank robbery suspect was a white male. Boatman saw the people go through the back door of the first apartment on the bottom floor at the corner, and he told Gilreath which apartment the people went into. Gilreath then called and informed the FBI, including Agent Bukowski. Boatman then got out of his car and walked on the walkway that connects the apartment complex parking lot and the Weigel's nearby and met Gilreath, Morrell, and Spence in the Weigel's parking lot to describe to them the location of the apartment of interest and to discuss where in the apartment complex parking lot they should set up surveillance.

While Boatman was in the Weigel's parking lot with Gilreath, Morrell, and Spence, the Defendant and the white female who was with him walked in the same direction to the Weigel's and proceeded to go to a video machine. At the June 1 hearing, Boatman identified that the Defendant present in the courtroom was the man the investigators had been following. When the Defendant and the woman went to the Weigel's area, the investigators thought he might have become aware of their surveillance because he was looking around and at them, observing the car Gilreath had been driving, and noticing that they were all standing around together and talking. Boatman testified that the officers were "pretty concerned" that the suspects had spotted them. [Doc. 23 at 38-39]. The Defendant and the woman went back to the apartment complex.

9

Boatman then walked back to the apartment complex and moved his car to a spot less noticeable to the Defendant and continued to watch the apartment he had identified earlier. At that point, the minivan was gone but the dark Sentra remained in the parking lot. Boatman continued to communicate with Gilreath, who told him that FBI Agents Bukowski and Hughes were coming to the complex. Boatman testified that he believes that Bukowski and Hughes went straight to the apartment complex office upon their arrival, to speak with the office manager and discover who had been staying at the apartment in question. The agents asked Boatman to determine the apartment number, and he did so and relayed the number to the agents. During this time, Boatman continued to watch the Defendant on foot.

Boatman saw Agents Bukowski and Hughes, together with the apartment manager, pointing toward the apartment he had identified. At that point, Boatman saw the Defendant leave the apartment, look toward the agents and apartment manager, return to his apartment, then exit again and walk toward Boatman's car. Boatman told the agents that the Defendant was walking around, and when he saw the Defendant walk toward the office, he headed that way as well. Boatman testified that the Defendant took an indirect route to the mailboxes, which are located near the office. Boatman stated that he saw "at least three people" come toward the mailboxes from the direction the Defendant came and that they all took the direct route rather than the route taken by the Defendant. [Doc. 23 at 42].

After the agents and Boatman observed the Defendant go to the area of the mailboxes and turn around to walk back to his apartment, they decided to approach the Defendant and speak with him. Boatman, Bukowski, and Hughes walked toward the Defendant, who was then near the tennis courts, and "Bukowski simply called out and said 'Hey, can we talk to you?'" [Doc. 23 at 43]. The

Defendant stopped to talk to the law enforcement officers. Boatman stayed there for a short time while Hughes spoke with the Defendant, and Bukowski went to the apartment of interest, where Gilreath had gone. Boatman heard Hughes tell the Defendant that the officers were investigating a bank robbery, which the Defendant stated that he knew nothing about. Boatman stated that the Defendant told Hughes "that he wasn't interested in talking to the FBI because he knew from experience that they would twist his words." [Doc. 23 at 44]. Boatman testified that he performed a Terry frisk of the Defendant's person during the Defendant's encounter with Hughes and that he did not find any contraband. Boatman stated that no further questions were asked of the Defendant after he indicated that he no longer wanted to talk. Gilreath then called to Boatman, and Boatman walked down to the apartment.

A bit later, Bukowski told Boatman that Ashley Lasley, the Defendant's girlfriend, had given consent to search the Nissan Sentra. Boatman was not present when Ms. Lasley gave consent. Bukowski told Boatman that the Defendant had the key to the car and asked Boatman to go and obtain the key from the Defendant. Boatman did so and then assisted in the search of the car, while Bukowski and Ms. Lasley sat on the curb nearby. Boatman related that Ms. Lasley "was very cooperative and polite" but that she seemed to be "disappointed" that she found herself in that situation. [Doc. 23 at 46]. Boatman never heard Ms. Lasley tell any law enforcement officers to stop searching the Sentra. The car search led to the discovery of red dye stains inside of the trunk of the car in the inner body panel.

Gilreath then told Boatman that Bukowski had obtained consent to search the apartment and that his assistance was required in the search. Boatman testified that he did not enter the apartment prior to learning that Bukowski had obtained consent to search the apartment. Boatman never heard

11

Ms. Lasley tell any law enforcement officers to stop searching the apartment. Boatman related that Ms. Lasley was still cooperative at that point and that she did not seem confused. When Boatman entered the apartment, Bukowski and Ms. Lasley were sitting on the couch talking, and the conversation seemed like small talk and did not appear contentious. Boatman did not hear Ms. Lasley ask to speak with the Defendant.

At some point after Boatman had searched his assigned portion of the apartment, Mr. Hamilton, who identified himself as an attorney, came and spoke with Boatman. Mr. Hamilton told Boatman that he needed to speak with Ms. Lasley but did not identify her by name. Boatman told Mr. Hamilton that he could not speak with Ms. Lasley at the time. After Mr. Hamilton identified himself as an attorney, Boatman told him that he did not think Ms. Lasley had asked to speak with him or an attorney generally and that he could not come inside the apartment. Boatman stated that Mr. Hamilton never told him that the Defendant had said that law enforcement officers were not allowed to search the apartment.

On cross-examination, Boatman testified that over the span of time he was in the Weigel's parking lot, the Defendant and the white female made two trips to the Weigel's area, one when they went to the video machine and a second time when they came to the Weigel's parking lot, but Boatman did not see if they went into the Weigel's. As to the time when Boatman was watching the Defendant walk to the mailboxes, Boatman is unaware of whether the Defendant actually went to his mailbox, and stated that "[h]e very possibly could have," because the Defendant's arrival at that area was during the time when Boatman stepped into the manager's office to inform the agents of the Defendant's approach. [Doc. 23 at 51-52].

Boatman testified that when he was told by Bukowski to obtain the key to the Sentra from

12

the Defendant and he went to do so, the Defendant first stated that he did not have the key. Boatman knew that the Defendant had the keys because he had observed them on his person during the earlier Terry frisk. The Defendant emptied out his pockets to show the keys were not inside, but Boatman knew the Defendant had the keys on a lanyard around his neck and told the Defendant as much. The Defendant then took off the lanyard and dropped the keys to the ground. Boatman told the Defendant that he was telling, rather than asking him for the keys.

After Mr. Hamilton identified himself as an attorney and asked to speak with Ms. Lasley, Boatman did not tell Ms. Lasley that an attorney was present and had asked to speak with her. Bukowski came outside and spoke with Mr. Hamilton at some point. Boatman believes that he or another officer asked Mr. Hamilton if he was Ms. Lasley's attorney and that Mr. Hamilton informed them that he was the Defendant's friend. Boatman heard either Bukowski, Gilreath or another office tell Mr. Hamilton that he had a conflict and could not speak with Ms. Lasley.

On redirect examination, Boatman confirmed that he never heard the Defendant say that the officers were not permitted to search the Nissan Sentra or the apartment.

*(D) Testimony of Special Agent David Bukowski*

Special Agent David Bukowski testified that he is employed with the FBI and is assigned to the Violent Crimes-Major Offender Squad, investigating violent crimes and other major offenses. Bukowski became involved in the investigation of the Defendant on February 1, 2012, when he responded to the bank robbery at the Enrichment Federal Credit Union. When he responded and investigated the robbery, he learned that the suspect had used a silver semiautomatic handgun and that the money taken from the robbery had a dye pack inside of it. Witnesses of the bank robbery related that the robber ran behind the bank, climbed over a fence, and got into a black Nissan. When

13

he did so, the dye pack activated and it appeared to witnesses as though the dye pack went into the trunk of the Nissan.

On February 3, 2012, Bukowski received a telephone call from Investigator Gilreath from the KPD, stating that he had seen a car in the Clinton Highway area that fit the description of the getaway car in the Enrichment Federal Credit Union robbery from two days before. After obtaining license tag information of the suspect vehicle from Gilreath, Bukowski did computer work to identify the registered owner of the car and look at some pictures. Bukowski discovered that the car was registered to Ashley Lasley. After doing that research, Bukowski went to the Meadowood Apartments, where the Nissan and its occupants had already gone. When he arrived, Bukowski went to a parking lot away from the targeted apartment to meet with other law enforcement officers and formulate a plan of action.

After meeting, Bukowski and Special Agent Paul Hughes walked to the apartment complex office and spoke with the manager, Linda Overholt, to determine the occupant of apartment A-3, where surveillance officers had seen the Defendant and Ms. Lasley enter, and where the Nissan was parked. The apartment manager informed the agents that the Defendant's name, and not Ashley Lasley's, was on the lease but that she lived in the apartment as well. The manager stated that Ms. Lasley received mail at the apartment. Bukowski believes that the manager may have also related that Ms. Lasley's name was inside of the mailbox for the postman to see. The apartment manager additionally told the agents that Ms. Lasley dropped of the rent payment in the drop box for after-hours payments.

While the agents were still in the office, they were told that the Defendant had walked in front of the office building and down the sidewalk, so they exited the manager's office and

14

approached the Defendant. Bukowski did not speak with the Defendant, and after seeing that the Defendant did not attempt to flee, he and Gilreath went to apartment A-3 and knocked on the door. Ms. Lasley answered the door. Bukowski showed her his identification, asked if he could come in and speak with her, and was invited inside of the apartment. Ms. Lasley told Bukowski and Gilreath her name and other information, which he had obtained earlier from a computer printout. When Bukowski and Gilreath entered the apartment, Bukowski sat with her on the couch, with Gilreath standing in front of them on the other side of a coffee table. Bukowski testified that law enforcement officers do not generally go into apartments of unknown people alone, both for safety purposes and to have a witness to all interaction when dealing with a person of the opposite sex.

Ms. Lasley informed Bukowski and Gilreath that the Defendant is her boyfriend and that they had been together eight to ten months at that point. She stated that the two of them lived in the apartment together. Ms. Lasley was aware that the Defendant had a previous bank robbery conviction from Boston, Massachusetts. Ms. Lasley related that the Nissan Sentra parked in front of the apartment was hers and that both she and the Defendant used the car. She told them that she and the Defendant only had one set of car keys but that the Defendant had pawned his motorcycle, leaving the Sentra as their only vehicle. Ms. Lasley also told the officers that she and the Defendant had recently cleaned the Sentra.

After the discussion about the ownership and use of the car, Bukowski explained the concept of consent to Ms. Lasley. Bukowski testified that he told Ms. Lasley that the agents "were investigating a bank robbery and that her vehicle fit the description of the getaway vehicle." [Doc. 23 at 65]. Bukowski stated that he first asked for verbal consent and after she agreed, he retrieved a Consent to Search form. He filled out the information on the form and testified that he then went

15

over the form with Ms. Lasley. At the hearing, Bukowski identified the Consent to Search form [Exh. 1] that he, Ms. Lasley, and Gilreath signed. Bukowski stated that Ms. Lasley read the form herself and that he then summarized the form for her as well, emphasizing that her consent must be voluntarily given. Bukowski further testified that he specifically discussed the right to refuse consent with Ms. Lasley. Bukowski stated that Ms. Lasley never asked questions about consent or about the form and that she did not appear to be confused or hesitant. He stated that Ms. Lasley was asked if she affirmatively understood the form, and she indicated that she did. Bukowski testified that he was present and witnessed Ms. Lasley sign the form. Bukowski stated that he never raised his voice to Ms. Lasley and never pointed a firearm at her. Bukoski said Ms. Lasley was "very pleasant" and "cooperative" throughout the process. [Doc. 23 at 70].

After Ms. Lasley signed the Consent to Search form [Exh. 1], the officers showed Ms. Lasley a surveillance photograph [Exh. 2] of a black Nissan Sentra from the Food City parking lot, which is separated by a fence and a field, from the Enrichment Federal Credit Union. A teller witness, who described the bank robber getting into a black Nissan after putting the dye pack in the trunk, saw the car in the Food City parking lot. Ms. Lasley told the officers that the car in the picture looked like hers, and she signed and dated the photograph.

After another officer obtained the keys to the Sentra, Bukowski, Gilreath, Boatman, and Ms. Lasley stood outside by the car when the search started. Ms. Lasley remained present throughout the duration of the search. Red dye stains were found on the Sentra's carpet and on the inside of the trunk lid. Bukowski testified that Ms. Lasley never attempted to interfere with or stop the search of the car and that she was calm for most of the time it took to complete the search. Bukowski stated that Ms. Lasley walked over and looked at the dye stains in the trunk herself and that she cried during

parts of the search. Bukowski estimated that the Defendant was approximately fifty yards from the Sentra during the search, that he could have heard the Defendant if he yelled, and that he never heard the Defendant object to the search. No other law enforcement officers informed Bukowski before or during the search that the Defendant had said they did not have permission to search the car.

While Boatman continued searching the Sentra, Bukowski, Gilreath, and Ms. Lasley went back into the apartment. Prior to going inside, Bukowski told Special Agent Hughes about the discovery of the red dye stains. Bukowski, Gilreath, and Ms. Lasley went back inside. Bukowski asked Ms. Lasley for consent to search the apartment for evidence of the bank robbery. He told her that the consent form would be the same type as they had gone over with regard to the Sentra. Bukowski did not tell Ms. Lasley what specific items law enforcement would be searching for but did tell her that they would not take any items unless they were related to the bank robbery.

Ms. Lasley asked Bukowski if she had the authority to give consent to search the apartment when her name was not listed on the apartment lease. In response to that inquiry, Bukowski asked Ms. Lasley a series of question, such as whether the apartment was "where she lived and if she had keys for access, if that is where her clothes were, [and] if that is where she slept." [Doc. 23 at 76]. Ms. Lasley indicated that she had keys and came and went from the apartment as she pleased, that the apartment was the only place she slept and kept her things, and that she received mail at the apartment address. Ms. Lasley told Bukowski that A-3 was a two-bedroom apartment but that she and the Defendant shared a bedroom and used the other bedroom as a television/computer room. At the conclusion of that conversation, Ms. Lasley gave oral consent to search and executed a second Consent to Search form [Exh. 3] for Apartment A-3 at the Meadowood Apartments. Ms. Lasley and Bukowski signed the second consent form. Bukowski testified that he did not go over the form,

which had provisions identical to those in the first consent form [Exh. 1], as extensively because he had thoroughly done so when discussing the search of the Sentra. Bukowski again stated that Ms. Lasley's demeanor was pleasant and calm and that she did not seem confused or ask questions except as pertaining to her name not being listed on the lease. Bukowski testified that the following items were seized from the apartment: "a black long-sleeve sweatshirt that was in . . . a basket on top of the dryer," with an apparent red dye stain on one sleeve, some hand towels that appeared to have been used to clean the car, a white towel that appeared to have a red dye stain, and several license plates. [Doc. 23 at 82].

Bukowski testified that Ms. Lasley's movements were not restricted throughout the duration of the evening and that she was permitted to go outside to smoke. When Bukowski exited the apartment to get paperwork from his car, he met David Hamilton, who was heading toward the apartment. Bukowski and Hamilton exchanged business cards, and Bukowski told Hamilton that he could not come into the apartment. Bukowski testified that he did not allow Hamilton to come into the apartment because the agents "were handling it as a crime scene." [Doc. 23 at 83]. Bukowski testified that he told Ms. Lasley that there was an attorney outside, and he believes that he showed her Hamilton's card. Bukowski stated that Ms. Lasley seemed familiar with Hamilton, but she indicated that she did not want to speak to anyone. Bukowski testified that Ms. Lasley never asked to speak with either the Defendant or Mr. Hamilton and that law enforcement did not restrict the use of her cellular telephone throughout the duration of their interaction.

Bukowski then testified that on February 7, 2012, he and Special Agent Hughes rang the doorbell at the Defendant's father Gary Lopez's residence. When Mr. Lopez opened the door, the agents, who had met Mr. Lopez on the night of February 3 during the search of the Defendant's

apartment, identified themselves again. Mr. Lopez seemed to recognize the agents, did not seem irritated, and thanked them for treating his son and Ms. Lasley's apartment with respect during the search a few days before.

The agents informed Mr. Lopez that they were there because they were continuing to investigate the robbery and explained that they were searching "for the gun and the bank robbery loot." [Doc. 23 at 86]. Bukowski testified that the agents asked Mr. Lopez for consent to search his home and that he denied consent to search the entire home because the Defendant "didn't come to the house in the main residence without him being there and he just said he wasn't going to give consent for the main portion of the house." [Doc. 23 at 87]. Mr. Lopez did give consent for the agents to search the garage and told them that a few days earlier, the Defendant called and told him that "he was going to bring some electronic boxes over to store in the garage." [Doc. 23 at 87]. As a result, Mr. Lopez expected the Defendant to come over. Instead, Mr. Lopez later discovered that the Defendant had come and put the boxes in the garage without telling him he was there. Bukowski testified that Mr. Lopez told the agents that he called the Defendant to ask why he had not come by the house yet and that the Defendant told him he had already come and gone. Bukowski stated that Mr. Lopez thought it was unusual for the Defendant to come by the house and not say "hello."

Bukowski testified that Hughes explained the concept of consent to Mr. Lopez and, in doing so told Mr. Lopez that consent had to be voluntarily given. After giving oral consent, Mr. Lopez signed a written Consent to Search form [Exh. 4]. The form lists "Garage space only" as the area to be searched and is dated February 7, 2012. Bukowski testified that he and Agent Hughes went over the form with Mr. Lopez, and Hughes and Mr. Lopez each signed the form.

Bukowski testified that after the consent form was executed, Gilreath and Anderson, who had

also come to the area but not inside the house, were asked to come and help with the search of the garage. In addition to limiting the search to the garage portion of the house, Mr. Lopez also relayed to the agents that he had family friends moving from the northeast to Tennessee and that they had some belongings stored in his garage. Mr. Lopez told the agents that he would not give them consent to search his friends' property. Bukowski testified that Mr. Lopez did not otherwise hesitate in giving the agents consent to search the garage and did not appear confused about the concept of consent or the form.

Bukowski, Hughes, Anderson, and Gilreath conducted the search of the garage. Bukowski testified that Mr. Lopez's friends' property was directly next to Mr. Lopez's property in the garage and that when the agents picked up his friends' property during the search, Mr. Lopez would at times tell the agents not to search that item and that he was not giving permission to search it. Bukowski stated that the agents did not open boxes that Mr. Lopez told them not to open.

Bukowski testified that when the officers first went into the garage, Mr. Lopez pointed out some blue boxes with white writing on the top shelf of a shelving unit and told the agents that he believed that those were the boxes that the Defendant had dropped off to store in the garage. Bukowski stated that Mr. Lopez did not tell him that the Defendant commonly stored property on the shelving unit or in the garage generally.

Bukowski stated that the boxes were not concealed in any way on the shelving unit and that they could be plainly seen when the agents entered the garage. Bukowski identified photographs [Exh. 6] of one of the boxes from the top of the shelving unit. He stated that this box was not locked or taped and had no handwriting or markings on it, other than what was commercially written on the box. From the outside, when the box was closed, it appeared to the agents as if there could be audio

20

equipment inside. When they opened the box, however, "[a] bag with red dye stained currency and a metal lockbox" were inside, and "[s]ome of the currency matched the bait money from the Enrichment Federal Credit Union." [Doc. 23 at 97]. The law enforcement officers then obtained a federal search warrant to open the lockbox and found a silver semiautomatic pistol with red dye inside.

Bukowski testified that Mr. Lopez never instructed the agents to stop searching while he was in the garage and that he did not express concern over the box in question. Bukowski stated that Mr. Lopez seemed pleasant and calm through the search of the garage but that he was "more disappointed" after they found what was inside the box. [Doc. 23 at 100]. Bukowski testified that Mr. Lopez never left during the search of the garage and that he was nearby when the box was opened.

On cross-examination, discussing the search of Mr. Lopez's garage on February 7, 2012, Bukowski testified that he, Anderson, Hughes, and Gilreath met before going to Mr. Lopez's home and planned for Bukowski and Hughes to obtain consent to search the house first and then call the other officers to come and assist in the search. As to the restrictions placed on the search by Mr. Lopez, Bukowski testified that Mr. Lopez "specifically" restricted the search of the property that belonged to his friends and was located in "one bay" of the garage. [Doc. 23 at 101]. Mr. Lopez told them at that time that he could not give consent to search those items because they were not his. When asked further about that, Bukowski stated that "[h]e said everything else in the garage that belongs to him and his garage we could search. What these other family friends had placed in the garage he was not going to give us consent for." [Doc. 23 at 101-102].

Bukowski stated that Mr. Lopez could not remember specifically when the Defendant had

brought over the boxes allegedly containing audio equipment but that it had been in early February. Bukowski reiterated that Mr. Lopez pointed out specific boxes that he thought may have been the new boxes of electronic equipment belong to the Defendant, and Bukowski believes that all of the relevant evidence was found in those boxes. Bukowski explained that Gilreath stood by the shelf and took down all of the boxes, passing them back down the line to the other law enforcement officers, so that the boxes could be opened on the floor. Bukowski testified that Mr. Lopez stood in the open area of the garage bay during that process. Bukowski stated that Mr. Lopez had indicated to them that he believed the electronics boxes belonged to the Defendant. He then clarified that while Mr. Lopez was not certain the electronics boxes were the ones placed in the garage by the Defendant, he knew that the boxes did not belong to him and did not indicate that they belonged to his friends who were moving. Bukowski said that the officers and agents did not request specific permission to open any of the boxes on the top shelf of the shelving unit. When describing the electronics box, inside which evidence was found, Bukowski stated that the box had slots on the side to lift and open the box, that the box was closed, and that the officers could not see inside of the box without opening it.

Bukowski testified that he was not involved in investigating the bank robbery which took place on December 13, 2011, but that he has reviewed photographs and documents from that case and recalls a small black Nissan or Honda being described as the getaway vehicle in the robbery. Bukowski stated that he did respond to the February 1, 2012 robbery and conducted one interview at the scene but was then called away to another unrelated bank robbery. Bukowski remembered focusing on a black Nissan Sentra or Altima as the getaway car in that robbery.

Discussing the events of February 3, 2012, Bukowski testified that he, Hughes, Gilreath, and

Anderson met in the parking lot of the apartment complex first and then he and Hughes walked to the apartment office. Bukowski stated that when he and Hughes left the apartment office, their plan was to approach the Defendant and attempt to speak with him and his girlfriend. When Bukowski left the other agents and officers talking to the Defendant and went to the apartment to speak with Ms. Lasley, he only knew that the officers were having a conversation and did not know if the Defendant would be detained. At some point, Ms. Lasley asked where the Defendant was, and Bukowski stated that he told her he was outside in the parking lot talking with other officers. Bukowski stated that he knew at the point when he went back into the apartment with Ms. Lasley after the car search that the Defendant had been arrested but that Ms. Lasley was "[p]robably not" told that the Defendant was arrested. [Doc. 23 at 113].

Bukowski testified that when Ms. Lasley expressed concern over her ability to consent to the search of the apartment, he asked her questions to determine whether he and Ms. Lasley thought that she had standing to consent. Bukowski stated that after she answered the questions, he believed that she did have standing and told her as much. Bukowski testified that the only thing he discussed with Ms. Lasley at that point was that the agents and officers wanted to search the apartment because they believed that it would contain evidence from the bank robbery but that she needed to voluntarily consent. Bukowski did not think that they discussed obtaining a warrant to search with either Ms. Lasley or Mr. Hamilton, the attorney.

Again going over his encounter with David Hamilton, Bukowski testified that he when he met him, Mr. Hamilton did not request permission to talk with Ms. Lasley. Bukowski stated that there was no discussion about whether Hamilton could speak with Ms. Lasley and that he did not hear any conversation between Boatman and Hamilton.

On redirect examination, Bukowski testified that Ms. Lasley told them that she had taken some college courses but had dropped out. Bukowski stated that the agents and officers never prevented Ms. Lasley from going anywhere she pleased, that she never asked to be alone, and that she never asked them to leave. When asked whether there was anything Ms. Lasley wanted to disclose before the search of the apartment began, she told Bukowski that there was marijuana paraphernalia in the bathroom off the master bedroom. Ms. Lasley also told Bukowski that the Defendant used Percocet, which he did not have a prescription for, once per day.

*(E) Testimony of Task Force Officer Kenneth Todd Gilreath*

Officer Kenneth Todd Gilreath testified that he works for the KPD as a Federal Task Force Officer assigned to the FBI Violent Crimes Task Force, investigating violent crimes, bank robberies, carjackings, and gang and drug crimes. Gilreath testified that he first became involved in the investigation related to the Defendant on the day of the Enrichment Federal Credit Union bank robbery on February 1, 2012.

Gilreath went to the bank and interviewed tellers and witnesses on the day of the robbery, and they told him the weight, height, and build of the robber and that he used a silver pistol. They further described that the robber ran behind the bank, crossed a fence to the Food City parking lot, and got into a dark or black Nissan Sentra or Maxima. The witnesses told Gilreath that the tellers passed an explosive dye pack to the robber and that the dye pack exploded as the robber crossed the fence, allowing them to see red smoke coming from the bag. The witnesses stated that the robber opened the trunk and threw the bag inside and drove away.

On February 3, 2012, Gilreath had "some really good pictures of the getaway vehicle" that had been obtained from the surveillance video camera at Food City and went to the Nissan

24

Dealership on Clinton Highway to ask an employee to tell him what make, model, and year the car was. Someone working at the dealership told Gilreath that the car in the surveillance photographs [Exh. 8] appeared to be between a 2001 and a 2004 model Nissan Sentra. Gilreath also had a partial license plate from the suspected getaway car. After the dealership, Gilreath parked on the side of the road approximately 600 to 700 yards from the Enrichment Federal Credit Union and a half mile from the ORNL Credit Union, robbed in December, and worked on his laptop. At that point, he thought it was possible that the same robber had robbed the banks in December and February because they had similar *modus operandi* and were within one mile of each other. Gilreath chose his spot and timing due to its proximity to the two banks and the fact that both robberies took place in the afternoon hours.

During his surveillance, Gilreath saw that a 2002 or 2003 Nissan Sentra pulled into the Food City parking lot, so he crossed the lanes of the road and went into the same parking lot and found the car parked in the lot and took pictures [Exh. 7] of it. Gilreath then parked and called Sergeant Boatman, his KPD supervisor, as well as Special Agent Bukowski, and informed them that he thought he had found the car from the February 1, 2012 robbery. When observing the car, Gilreath saw that the first three numbers of the license plate were "736," which was "[s]omewhat" troubling, because he had previously been told that the first three numbers of the car sought may have been "134." [Doc. 24 at 132]. However, he knows that bank robbers often switch license tags on cars they use and that it was raining the day of the robbery.

While watching in the parking lot, Gilreath eventually saw the Defendant come out and get into the driver's seat and Ms. Lasley get into the passenger's seat of the Nissan. Gilreath observed that the Defendant met the description of the bank robber in height, weight, and build. Gilreath also

25

determined that the hubcaps and taillights were identical to the ones on the car in the surveillance photograph. Gilreath watched the Defendant drive over and meet with someone in a different car, and then he followed him out of the parking lot and toward the Meadowood Apartments. At that point, Boatman, Special Agent Anderson, and Investigators Spence and Morrell had joined in the surveillance.

After discussing the plan with Bukowski and Special Agent Hughes and deciding they would head to the apartment manager's office, Gilreath waited in his car and listened to radio traffic. Bukowski then asked him to come and meet him at the Defendant's apartment. When Gilreath went to the apartment to meet Bukowski, he saw Boatman, Anderson, and Hughes speaking with the Defendant. Gilreath related that he and Bukowski knocked on the door of the apartment and identified themselves to Ms. Lasley. They requested to come inside and speak with her, and she invited them in. Gilreath testified that Bukowski primarily spoke with Ms. Lasley, while he stood four or five feet from them on the other side of the coffee table.

Ms. Lasley told Bukowski and Gilreath that after she began dating the Defendant, she moved into the apartment. She told them that the Defendant had recently completed federal supervised release for a bank robbery in Boston. Ms. Lasley told them that the Nissan Sentra parked outside belonged to her and that she allowed the Defendant to drive it. She also told them that she and the Defendant had recently cleaned the car. Gilreath stated that Bukowski went through the consent form [Exh. 1], with Ms. Lasley, explained the form, and asked if she understood everything on it. Gilreath testified that Ms. Lasley was permitted to read the form on her own, that she did not seem confused or hesitant, and that she had no questions about giving consent to search her car. Gilreath stated that after signing the consent form, Ms. Lasley identified the car in one of the photographs he

had taken to the Nissan dealership earlier in the day as looking like her car and signed and dated the photograph.

Gilreath then testified about the searches of the Sentra and the apartment, and his testimony was consistent with that of Bukowski and the other law enforcement witnesses. Like Bukowski, Gilreath stated that Ms. Lasley was informed of Mr. Hamilton's presence at the scene by Bukowski and that she did not say that she wanted to talk to him.

Gilreath next testified about the day that Mr. Lopez's house was searched. Gilreath stated that he and Special Agent Clay Anderson remained in Gilreath's car and waited while Bukowski and Hughes went to Mr. Lopez's home to ask for consent to search. Gilreath and Anderson then received a call to come to the house. Mr. Lopez stood at the entrance to the garage with Bukowski and Hughes. Gilreath then learned that Mr. Lopez had given consent to "look in a specific area of the garage, and the garage door . . . there [were] some items in that garage that . . . had been placed there by some friends . . . [and] he did not feel he that he could give consent to look in their property." [Doc. 23 at 154]. Gilreath testified that Mr. Lopez told them that they could look "anywhere else in his garage." [Doc. 23 at 154].

Gilreath stated that Mr. Lopez was present during the entire search of the garage. He said that most of Mr. Lopez's friends' items were to the left in the garage and that he would tell the agents and officers if they picked something up that belonged to his friends. Gilreath stated that if Mr. Lopez told them not to open a specific box or bag then they did not open it. Gilreath identified the blue boxes on the top shelf of the metal shelving unit as the boxes that Mr. Lopez specifically pointed out as stereo equipment that the Defendant had said he would bring by to put in the garage. Gilreath believes that Mr. Lopez said that he did not recall those boxes being in the garage and that

they looked like stereo equipment. Gilreath was not sure if Mr. Lopez told them whether the other items on the shelving unit belonged to Mr. Lopez or to the Defendant.

Gilreath stated that he was the one who picked up the specific blue box pointed out by Mr. Lopez and passed it down the line to Bukowski. Gilreath testified that the box was not taped or locked and that he did not see any large handwriting on the box. He stated that the box looked as if it had stereo equipment inside. Gilreath stated that Mr. Lopez was nice throughout the search of the garage and that it seemed like Mr. Lopez would have told them not to search an item if he did not want them to search it.

On cross-examination, Gilreath stated that Mr. Lopez told them that he did not give consent to search his friends' items because he did not feel like he had the right to give them that permission because those items belonged to his friends. Gilreath stated that when he pulled the cardboard box from the top of the shelf, he knew that it was the box that Mr. Lopez thought the Defendant had put in the garage. He testified that they opened all or almost all of the boxes in the vicinity of the shelving unit in the garage. Gilreath stated that Mr. Lopez stood and walked around near the entrance of the garage and that his mobility was limited by his prosthetic leg.

*(F) Testimony of Agent Paul Hughes*

Special Agent Paul Hughes testifies that he works with the FBI and is assigned to the Violent Crime-Major Offender Squad and the Safe Streets Task Force. He responded briefly to the February 1, 2012 robbery of the Enrichment Federal Credit Union. His testimony was consistent with Bukowski's, Gilreath's, and Boatman's regarding his arrival and involvement with the events of February 3, 2012, at the Meadowood Apartments.

Discussing the initial contact with the Defendant, Hughes stated that he identified himself,

showed his credentials, and informed the Defendant that they were investigating a bank robbery. The Defendant then said something to the effect that he did not know anything about a bank robbery. Hughes asked the Defendant if he would come to the FBI office to speak with agents, and the Defendant said he was unavailable due to work the next day but that he would come the next Monday. The Defendant then stated that he had dealt with the FBI before when arrested for a bank robbery "up north" and did not trust them. [Doc. 23 at 173-74]. The Defendant then told Hughes that he did not want to speak with him more without an attorney. Hughes testified that he no longer asked the Defendant about the case at that point.

Hughes stated that the Defendant matched the physical description of the robber from the February 1, 2012 robbery of the Enrichment Federal Credit Union, with similar height, weight, and build. After the Defendant stated that he no longer wanted to speak with Hughes, the Defendant asked if he was free to leave and Hughes told him that he was not. Hughes testified that the Defendant was not free to leave at that point because the officers had seen the car he was driving, which matched the appearance of the getaway car, because the Defendant matched the physical description of the bank robber, and because the Defendant informed him that he had been arrested previously for bank robbery. Hughes stated that in his experience, it is common for bank robbers to commit additional future bank robberies. Hughes additionally was not sure at that point whether the Defendant would attempt to flee, and knowing that a firearm had been used in the robbery escalated the safety concerns involved. Hughes wanted to prevent the Defendant from returning to his apartment in case there was a weapon inside. Hughes then asked Spence and Morrell to stay with the Defendant, and he walked toward the Nissan Sentra.

Hughes was the one to handcuff and arrest the Defendant after the red dye stains were

29

discovered in the trunk and on the trunk lid of the Sentra. Hughes believes that it was approximately twenty minutes between when he told the Defendant he was not free to leave and when he was arrested.

On cross-examination, Hughes testified that it appeared that the Defendant did not want to give the key to the Nissan Sentra to Boatman when he was asked for it.

Hughes was also present for the search of Gary Lopez's garage on February 7, 2012. Hughes testified that Mr. Lopez gave permission for law enforcement to search a "portion" of his garage and that Mr. Lopez was friendly. Hughes stated that he was the one who actually asked for Mr. Lopez's consent to search and that Mr. Lopez limited the scope of the search to which he was consenting. Hughes told Mr. Lopez that they were searching for evidence related to the bank robbery, that the officers "had to have his permission," that the search "had to be voluntary," and that "[i]f [Mr. Lopez] wanted [the officers] to stop, he was free to tell [them] to stop." [Doc. 23 at 183].

Hughes testified that Mr. Lopez was present throughout the duration of the search and that he told them several times that they could not search certain items when they picked them up. Hughes related that Mr. Lopez never stated that the Defendant commonly stored items in his garage or that all of the items on the top shelf of the shelving unit belonged to the Defendant. Looking at photographs [Exh. 6] of the box at issue, Hughes testified that there were special markings on the box and that from the outside, the box could have contained audio or electronic equipment. Hughes was the agent who opened the box in the garage that day, and he testified that Mr. Lopex was "[s]tanding about two feet away watching [him]" when he did. [Doc. 23 at 189]. Hughes stated that Mr. Lopez never told him not to open the box. Hughes testified that Mr. Lopez made the comment that he did not believe the Defendant had robbed the bank until he saw the money inside the box.

On cross-examination, Hughes testified that he did not ask Mr. Lopez whether the Defendant commonly stored items in his garage or for how long he had done so. Hughes stated that he believed the blue box to be the Defendant's based upon what Mr. Lopez had said. The officers did not ask which boxes were the Defendant's and which were Mr. Lopez's.

### (G) Testimony of Agent Clay Anderson

Special Agent Clay Anderson testified that he works with the FBI in the Violent Crime-Major Offender Squad. Agent Anderson obtained the surveillance photographs of the Nissan Sentra in the Food City parking lot from the Food City manager. Anderson joined the surveillance of the Defendant's car with Task Force Officer Gilreath on February 3, 2012. He remained in the apartment complex parking lot away from the main office while others went to speak with the manager. He approached just as Hughes was making the initial contact with the Defendant. He then engaged the Defendant in small talk, not asking about the bank robbery.

Anderson said he remained with the Defendant to ensure that the Defendant did not attempt to flee. He also stated that he was concerned at first that the Defendant may be armed because he was aware that a weapon was used in the bank robbery. Anderson's testimony regarding the events at issue was consistent with that of all other officers and agents.

### (H) Testimony of Ashley Lasley

Ashley Lasley testified that the Defendant is her boyfriend and that she has known him for a little over one year. Ms. Lasley testified that on February 3, 2012, law enforcement officers knocked on her door while the Defendant was outside, showed their badges and stated their names. Ms. Lasley told them they could come inside. She stated that they first asked her name and if they could come in to ask her some questions. Ms. Lasley related that the first question they asked was

31

if she knew the Defendant and his background, and she confirmed to them that he was her boyfriend and that she was aware of his background. She testified that she did not express any concern about where the Defendant was at that point because he told her he was going to check the mailbox and she assumed he was still doing that.

Ms. Lasley stated that the officers asked where the Defendant was on a specific date and that they showed her a picture of a black Nissan and asked if it was her car. She testified that she told them she could not see the license tag number in the picture but that she does own a black Nissan and that it looked like the one in the picture. Ms. Lasley related that "[t]hey told me it pretty much was my car I guess because it was raining that day and my car the hood of it was like a dark color where it had a primer on it. I guess where it was raining it all looked clear." [Doc. 23 at 219-20]. She stated that she told the officers that the car in the picture did not look like hers because her car has a dark hood. Ms. Lasley testified that the officers "made [her] sign the picture," but she then clarified that they "asked [her] to sign [her] name on the picture of [her] car." [Doc. 23 at 220]. Ms. Lasley stated that at that point the officers had not told her any information about the Defendant. She testified that she asked to see him but that they told her it would be in her best interest not to see him.

Ms. Lasley testified that the officers asked her if the car was hers and that she told them it was and that it was registered in her name. She stated that she signed a Consent to Search form and that she was not allowed to leave afterward, as someone was always with her. Ms. Lasley related that she did not have the keys to her car with her, because the Defendant had taken them with the mailbox key. She told the officers that the Defendant had the keys, and they went to get them from him. She stated that she then went outside with the officers when they opened her car to search. Ms. Lasley stated that while she sat on the curb, the officers opened the trunk and "took the lining of

32

[her] car trunk and they took pictures of everything and went through all [her] papers in it." [Doc. At 222]. Ms. Lasley stated that she did not see the Defendant during the search of the car.

After the search of the car, Ms. Lasley went back inside of the apartment with the officers and they asked for permission to search it. She stated that her initial response was that she did not pay the bills and that her "name wasn't on anything," so she could not give them consent to search. [Doc. 23 at 222-23]. Ms. Lasley testified that the officers told her they were going to speak with "the apartment people" and that they came back after several minutes and told her that it was "okay" for her to sign the consent form for the search of the apartment. [Doc. 23 at 223]. Ms. Lasley stated that the officers did not give her advice as to whether to sign the consent form but that they told her it would be in her best interest to do so and that they would help her out if she did. Ms. Lasley testified that the officers did not read the consent form to her, but gave it to her to read. Ms. Lasley stated that she did not feel like she had the option not to sign the consent form because the FBI agent sitting on the couch with her was "very pushy on everything." [Doc. 23 at 224]. She related that the officers never told her she had to sign the form and that she does not recall them mentioning the word "warrant."

Ms. Lasley stated that she did not feel like she could go wherever she wanted during this process because someone was always with her. She said that an hour or two into the search of the apartment, she asked if she could smoke a cigarette on the back porch, and someone escorted her to do so. Ms. Lasley testified that she knows who David Hamilton is because she has seen him speak with the Defendant before and knows he is a lawyer, but that she did not see him during the car search. She said that she never saw Mr. Hamilton the night of February 3, 2012, but that she found out that he had requested to speak with her when the Defendant's father, Gary Lopez, came to the

apartment later. Ms. Lasley found out that the Defendant was under arrest after law enforcement searched the Nissan Sentra.

On cross-examination, Ms. Lasley testified that she is twenty-four years of age and that she graduated from high school and attended one year of college. Ms. Lasley stated that she and the Defendant are still in a relationship, that she still loves him, and that she does not want him to go to prison. Ms. Lasley testified that she was aware that the Defendant had prior bank robbery convictions and that he had served time in prison. Ms. Lasley stated that she was "pretty shocked" when the officers showed up at her door and told her that the Defendant was suspected of committing another bank robbery.

Ms. Lasley stated that two FBI agents came to speak with her in the beginning, that they were not yelling or pointing firearms at her, that they used a nice tone of voice with her, and that she never told them to leave the apartment. After being shown Exhibit 2, Ms. Lasley stated that she signed the photograph because it was her car in the picture and that no one forced her to sign it. Ms. Lasley testified that she and the Defendant had cleaned out the Nissan Sentra the day before the officers came to her apartment. Ms. Lasley related that the agents told her that her consent to search needed to be voluntary. She also thought they told her that she had a right to refuse consent. She stated that she understood everything related to the consent for the search of her car, and she identified her signature on the consent form [Exh. 1]. She testified that she did not hesitate to give this consent and that she was not confused by the form, which she read.

Ms. Lasley testified that she never told the officers to stop searching her car and that she had no problem with them searching it because she did not think there would be anything of consequence inside. Ms. Lasley stated that she was surprised when the officers found dye stains in her car and

34

that she started crying at that point. She stated that she got emotional because of what they found and not because they were searching, as she had given them permission.

Ms. Lasley reiterated that someone was always with her when she walked around that day, but she stated that she was never stopped from going into any part of the apartment or using her cellular telephone. She stated that no one told her that an officer needed to be with her at all times and that she never asked if she could leave. Ms. Lasley testified that no one ever told her that there was an attorney outside. Ms. Lasley testified that the two FBI agents who had been with her the whole time (Bukowski and Gilreath) remained with her while some officers who were outside the apartment went to speak with the apartment manager. She stated that they then said they had spoke to the apartment manager and determined that it was alright for her to sign the consent form.

Ms. Lasley testified that she and the Defendant lived in the apartment together and had since July 2011. She stated that they shared a bedroom and used the other bedroom as an office. Ms. Lasley related that she had free access to the whole apartment, had keys, received mail there, kept her clothes there, and did not live anywhere else. Ms. Lasley testified that she and an FBI agent discussed all of those details and that she related that information before she gave consent to search the apartment. Ms. Lasley stated that the agents told her that her consent had to be voluntary and showed her the same consent form. She stated that she knew she had a right to refuse consent and that they told her as much. Ms. Lasley stated that she did express confusion over the voluntariness of the consent because she told them that no documents were in her name, so she could not give permission to search. Afterward, she testified that there is nothing confusing about the consent she gave to search the apartment and identified her signature on the consent form [Exh. 3]. She stated that she affirmatively told the agents that she understood her rights when she read the Consent to

Search forms and that she was given ample opportunity to read the forms.

Ms. Lasley stated that she asked to see the Defendant for a second time before signing the second consent form and that she was told she could not. Ms. Lasley did not attempt to call the Defendant or walk out of the apartment to see him. She stated that they told her he was being detained after her car was searched.

On redirect examination, Ms. Lasley again stated that the agents told her it was in her best interest to sign the consent form and that she did not feel like she could choose not to sign the form, as the agent next to her was intimidating. On re-cross-examination, Ms. Lasley testified that she never told the agents that she felt unable to give consent.

*(I) Testimony of Gary Lopez*

Gary Lopez testified that he is the Defendant's father and has lived in Tennessee since 2005 or 2006. Mr. Lopez stated that he attended one year of college. Mr. Lopez testified that when he moved to Tennessee, the Defendant was in prison and that he was in possession of some of the Defendant's belongings in storage. He stated that he moved into his current home in July 2006 and that he had some of the Defendant's items at the time, so he stored them in his garage to keep for the Defendant. Mr. Lopez testified that the Defendant has stored boxes of belongings with him in 2010 and 2011 and that the Defendant keeps boxes and tools at Mr. Lopez's house because the Defendant's apartment complex did not have a storage unit. Mr. Lopez stated that the Defendant specifically kept items at his house on the top shelf of the metal shelving unit against the wall in his garage.

Discussing the agents' visit to his house, Mr. Lopez testified that the agents knocked on the door, identified themselves, and asked if they could search the house for items in connection with

36

the Defendant. Mr. Lopez does not recall whether the agents asked if they could search the whole house or the garage specifically. Mr. Lopez stated that he gave the agents consent to search the garage and signed a form to that effect.

Mr. Lopez stated that he was in the middle of the garage near the door when the agents started searching the garage. He testified that he told the agents that "there were items in [the garage] that didn't belong to [him]" and that "[t]hey could search anything of [his] that they wanted to." [Doc. 23 at 251]. Mr. Lopez stated that he specified that the stuff on the top shelf of a shelving unit against the wall was the Defendant's and that everything in bags on the floor belonged to his friends, the McKenzies. Mr. Lopez related that one of the agents opened boxes or bags that belonged to the McKenzies at times and that he would tell him to stop because it did not belong to him. He testified that he limited the search "[b]ecause if someone keeps something at my house and I am responsible for it, I am not going to let anybody go in it without their permission," and the McKenzies and the Defendant had "entrusted" their items to him. [Doc. 23 at 255].

Mr. Lopez identified a photograph [Exh. 5] of his garage. He stated that the agents went through everything on and around the shelves. Mr. Lopez testified that the agents asked him if the Defendant had left anything in the garage. He said that he told them the Defendant had called a couple weeks before and asked if the garage was unlocked, so that he could put audio equipment inside for storage. Mr. Lopez did not see which boxes the Defendant left there at that time, but when asked by the agents if anything in the garage looked out of place, he noticed one specific box "sticking up above the rest of the stuff" and told the agents that he did not "remember that box being there." [Doc. 23 at 253]. Mr. Lopez testified, "That is all I said." [Id.]. He stated that he noticed the box because the Defendant was a "neat freak" and that box "seemed out of place." [Id.].

Mr. Lopez related that the agents then went through items in the garage, including taking items from the shelves and looking through them. Mr. Lopez testified that he then went inside of the house to either let his dogs out, to go to the bathroom, or for some other reason, and that when he came back the agents "had a blue box on the floor and they had it open and had another box in it and a white plastic trash bag thing." [Doc. 23 at 254]. Mr. Lopez stated that the agents never asked if they could open that box and that he believes that the agents knew the box belonged to the Defendant when they opened it.

Mr. Lopez did not remember, but did not think, that he denied the agents consent to search his house in its entirety that day because it did not matter to him whether they searched it.

On cross-examination, Mr. Lopez stated that he is aware that the Defendant has at least one prior bank robbery conviction. Mr. Lopez testified that he was familiar with Agents Hughes and Bukowski when they knocked on his door on the day they searched the garage from going to the Defendant's apartment on the night of his arrest and to the Defendant's initial appearance in court. Mr. Lopez confirmed that he thanked the agents for not trashing the Defendant and Ms. Lasley's apartment during the search, and he stated that he believes that he is on good terms with the agents and officers. Mr. Lopez said that all but one of the agents had always been cordial and polite with him. He stated that he voluntarily gave consent to search his garage and did not mind doing so because he had nothing to hide.

Mr. Lopez identified his signature on the consent form [Exh. 4] and confirmed that he read the form. Mr. Lopez testified that before he signed the form, he asked the agents if it was consenting to the search of his stuff and that they told him it was. Mr. Lopez reiterated that he told the agents that either in the few days or week or two prior, the Defendant had asked if he could drop off boxes

38

of audio equipment at his house. Mr. Lopez testified that he told the agents that they could not search things that belonged to "other people" and that he had pointed out the Defendant's items, as well as the McKenzies'. [Doc. 23 at 260]. Mr. Lopez then identified on a photograph of his garage [Exh. 5], which items were the McKenzies'. Mr. Lopez stated that all but one of the officers and agents listened and stopped searching items that he identified as the McKenzies'.

Mr. Lopez testified that he does not feel free to look into the Defendant's boxes at his belongings and has not since the Defendant was a teenager. Looking at the photograph of his garage [Exh. 5], Mr. Lopez confirmed that the blue box had been sitting unconcealed on top of the shelf, with no handwriting on it that he remembered. Mr. Lopez testified that if witnesses testified that he was present in the garage for the entire search or that he was a few feet away when the blue box was opened, then they would be lying. Mr. Lopez identified photographs [Exh. 6] of a box that looked substantially similar to boxes that the Defendant often kept in his garage.

Mr. Lopez testified that he had not thought the Defendant had robbed another bank before the box was opened because he did not think the Defendant would ever do that again, but confirmed that when the box was opened it became clear that he had robbed the bank. Mr. Lopez testified that he loves his son and does not want him to go to prison but that he will not lie for him. The silver lockbox found inside of the blue box was not opened inside of Mr. Lopez's garage or house.

Mr. Lopez testified that he was not home when the Defendant called and asked to drop boxes off in his garage. He stated that on the relevant occasion after having told the Defendant the garage was unlocked, he called the Defendant later and found out he had already been by the house. Mr. Lopez stated that there are times that the Defendant is in his house unattended.

39

### III. FINDINGS OF FACT

Based upon the testimony and exhibits presented at the June 1 hearing, the Court makes the following findings of fact:

On February 1, 2012, an individual robbed the Enrichment Federal Credit Union. KPD/FBI Task Force Officer Kenneth Gilreath responded to the bank robbery. Gilreath interviewed tellers and witnesses on the day of the robbery. They told Gilreath the weight, height, and build of the robber and that the robber used a silver pistol. They further described that he ran behind the bank, crossed a fence to the Food City parking lot, and got into a dark or black Nissan Sentra or Maxima. The witnesses told Gilreath that the tellers passed an explosive dye pack to the robber and it had exploded as the robber crossed the fence. The witnesses saw the red smoke coming from the robber's bag. The witnesses stated that the robber opened the trunk, threw the bag inside, and drove away.

On February 3, 2012, Gilreath received pictures of the getaway vehicle from another agent taken by the Food City surveillance video camera. Gilreath took these pictures to a Nissan dealership to learn the make, model, and year of the car. An employee told him that the car appeared to be between a 2001 through 2004 model Nissan Sentra. After Gilreath left the dealership, he parked his vehicle approximately 600 to 700 yards from the Enrichment Federal Credit Union and a half mile from the ORNL Credit Union, which had been robbed in December 2011. Gilreath thought it was possible that the same person robbed both banks because of similar *modus operandi* and they were located within one mile of each other. While Gilreath was watching the area, he saw a 2002 or 2003 Nissan Sentra pull into the Food City parking lot. The vehicle fit the description of the getaway car in the Enrichment Federal Credit Union robbery and matched the car, including the hubcaps and taillights, in the photograph from the Food City surveillance camera.

Gilreath called KPD Sergent Andrew Boatman and FBI Agent David Bukowski and informed them that he had found the car from the February 1, 2012 bank robbery. Bukowski obtained license tag information and discovered that the vehicle, a Nissan Sentra, was registered to Ashley Lasley. Gilreath, who still had the Nissan under surveillance, watched the Defendant get into the driver's seat. The Defendant matched the description of the bank robber in height, weight, and build. Gilreath followed the Defendant to Meadowood Apartments. Boatman, Bukowski, FBI Special Agents Clay Anderson and Paul Hughes, and KPD Investigators Michael Spence and Glenn Morrell joined in the surveillance at the apartment complex.

While Bukowski and Hughes spoke with the apartment manager, Boatman continued to watch the Defendant. Boatman saw the Defendant leave his apartment, look towards the agents speaking with the apartment manager, return to his apartment, then exit again and walk toward Boatman's car. Boatman saw the Defendant take an indirect route to the mailboxes. At that point, Boatman, Bukowski, and Hughes walked toward the Defendant. Bukowski concluded his conversation with the apartment manager and, after seeing that the Defendant did not attempt to flee, immediately headed to the Defendant's apartment. The officers identified themselves and asked the Defendant if they could talk to him. The Defendant stopped, and Hughes told the Defendant that they were investigating a bank robbery. The Defendant stated that he did not know anything about a bank robbery. Hughes asked the Defendant if he would come to the FBI office and talk to them. The Defendant said he would come on Monday but not that day because he had to work the next day. The Defendant then stated that he had dealt with the FBI before when he was arrested for a bank robbery "up north" and did not trust them. [Doc. 23 at 173-74]. Boatman performed a Terry frisk on the Defendant. The Defendant asked if he was free to leave, and Hughes replied that the Defendant was

41

not free to go. The Defendant told Hughes he did not want to speak with him anymore without an attorney. The officers did not ask the Defendant any more questions. The Defendant was allowed to use his cell phone, and he called a family friend, who is an attorney.

While Hughes was speaking with the Defendant, Bukowski met Gilreath at the Defendant's apartment. Ashley Lasley answered the door and invited the officers inside. Bukowski sat on the couch with Ms. Lasley, while Gilreath stood in front of them. Ms. Lasley informed the officers that she was the Defendant's girlfriend and that the Nissan Sentra was her vehicle. She told the officers that both she and the Defendant used the vehicle. Bukowski explained the concept of consent to Ms. Lasley. Bukowski stated that the agents "were investigating a bank robbery and that her vehicle fit the description of the getaway vehicle." [Doc. 23 at 65]. Ms. Lasley gave verbal consent to search the Nissan Sentra. Bukowski reviewed a consent to search form with Ms. Lasley and filled out the information on the form. He emphasized that her consent must be voluntary. Bukowski asked if she understood the form. Ms. Lasley indicated that she understood. Ms. Lasley read the form and signed it. Ms. Lasley was cooperative throughout the process.

Ms. Lasley told the agents that the Defendant had the key to the Sentra. Bukowski asked Boatman to obtain the Sentra's key from the Defendant. The Defendant told Boatman that he did not have the key and emptied his pockets to show the keys were not inside. Boatman told the Defendant the keys, which Boatman could see, were on a lanyard around the Defendant's neck. The Defendant then took off the lanyard and dropped the keys to the ground.

Bukowski, Gilreath, Boatman, and Ms. Lasley were present outside by the car when the search started. The Defendant was approximately fifty yards from the Sentra during the search. The Defendant did not object to the search. Ms. Lasley remained present throughout the search and did

42

not object. Red dye stains were found on the carpet and on the inside of the trunk lid of the Sentra. Hughes then formally arrested the Defendant. When Mr. Hamilton, an attorney and family friend arrived, he was allowed to speak with the Defendant.

Ms. Lasley, Bukowski, and Gilreath returned to the apartment. Bukowski asked Ms. Lasley if she would consent to a search of the apartment. He informed her that the consent to search the apartment was the same form as the consent form for the search of the Nissan Sentra. Bukowski did not tell Ms. Lasley the specific items for which he wanted to search but told her that the officers would not take any items unless they were related to the bank robbery. Ms. Lasley asked Bukowski if she had the authority to consent to the search of the apartment because her name was not on the lease. In response, Bukowski asked Ms. Lasley a series of questions regarding her connection with the apartment. Ms. Lasley said that she had keys to the apartment, that she had full access to the apartment, came and went as she pleased, that the apartment was the only place she slept and kept her things, that she and the Defendant shared the bedroom, and that she received mail at the apartment. Ms. Lasley gave oral consent to search the apartment and then signed the Consent to Search form. Bukowski did not go over the form because it was identical to the Consent to Search form for the Nissan Sentra.

During the search of the apartment, the officers seized a black sweatshirt with red dye stains on it, hand towels that appeared to have been used on the car, a white towel with red dye stains, and several license plates. Ms. Lasley's movements were not restricted during the search of the apartment.

As Bukowski exited the apartment after the search, Mr. Hamilton was heading towards the apartment. Bukowski told Mr. Hamilton that he could not go inside. Bukowski told Ms. Lasley that

43

Mr. Hamilton was outside. Ms. Lasley stated that she did not want to see anyone.

On February 7, 2012, Bukowski and Hughes went to the home of Gary Lopez, the Defendant's father. They informed Mr. Lopez that they were continuing to investigate the robbery and were searching "for the gun and the bank robbery loot." [Doc. 23 at 86]. The agents asked Mr. Lopez if they could search his home. Mr. Lopez denied consent to search the entire house because the Defendant "didn't come to the house in the main residence without [Mr. Lopez] being there." [Doc. 23 at 87]. Mr. Lopez stated that the agents could search the garage. He also told them that a few days prior, the Defendant called and told him that "he was going to bring some electronic boxes over to store in the garage." [Id.]. Mr. Lopez expected to see the Defendant when he came but discovered that the Defendant had come and put the boxes in the garage without telling Mr. Lopez he was there.

Bukowski explained the concept of consent to Mr. Lopez and that consent had to be voluntary. Bukowski and Hughes went over the form. Mr. Lopez gave oral consent and then signed a written Consent to Search form. The form indicated it was only for the garage space.

After the consent form was executed, Gilreath and Anderson came to help with the search. Mr. Lopez told the officers that he had family friends who stored their belongings in his garage. Mr. Lopez informed the officers that he would not give consent to search the family friends' belongings because they did not belong to him. When the agents picked up an item that belonged to a family friend, Mr. Lopez objected to the search of it, and the officers did not search that item. Mr. Lopez pointed to some blue boxes with white lettering on the top of a shelving unit in the garage. Mr. Lopez told the officers that he believed those were the Defendant's, and that they had been placed there recently. Mr. Lopez did not tell the agents that the Defendant commonly stored property on the

shelving unit or in the garage generally. Mr. Lopez remained present during the entire search and was pleasant and calm.

The Defendant's boxes were not concealed in any way but were in plain view. The boxes were not locked, taped, and had no handwriting on the outside. The boxes were closed and contained commercial markings on the outside. The agents looked in one of the boxes and found "[a] bag with red dye stained currency and a metal lockbox" inside, and "[s]ome of the currency matched the bait money from the Enrichment Federal Credit Union." [Doc. 23 at 97]. The law enforcement officers then obtained a federal search warrant to open the lockbox and found a silver semiautomatic pistol with red dye inside.


## IV. ANALYSIS

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. A search conducted without a warrant is unreasonable "subject only to a few specifically established and well-delineated exceptions." Clemente v. Valso, 679 F.3d 482, 489 (6th Cir. 2012) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). One exception to the search warrant requirement is consent by a person with authority. Id.

In the present matter, the officers detained the Defendant and searched the Nissan Sentra and Defendant's apartment on February 3, 2012. On February 7, 2012, the officers searched the Defendant's boxes located in his father's garage. The Defendant challenges all three searches. First, the Defendant asserts that the consent to search the Nissan Sentra and the apartment was invalid because he was illegally detained at the time and because his girlfriend did not voluntarily consent. Second, the Defendant argues that the search of his father's garage was in violation of the

45

Defendant's Fourth Amendment privacy interests and that Mr. Lopez did not have the authority to consent to the search of the boxes. The Government responds that the officers properly conducted all three searches pursuant to the consent of one with authority. The Court will address each of these issues in turn and will also briefly address the Government's alternative argument that even if the searches violated the Fourth Amendment, the officers were acting in good faith.

### (A) February 3, 2012 Searches of the Defendant's 2003 Nissan Sentra and Apartment

In his first motion, the Defendant contends [Docs. 16, 24] that the evidence obtained from searching the 2003 black Nissan Sentra and his apartment should be suppressed because the searches were conducted in violation of the Defendant's Fourth Amendment protection against unreasonable search and seizure. The Defendant claims that Ms. Lasley's consent to search the Nissan Sentra and the apartment was invalid as it was not given freely and voluntarily. The Defendant additionally argues that the officers detained him in the parking lot without reasonable suspicion in order to keep him from the area where his girlfriend was asked for consent to search and to prevent his objection to the search of his apartment. The Government contends [Docs. 20, 25] that the evidence obtained from the searches of the car and apartment should not be suppressed. The Government argues that Ms. Lasley had the authority and the understanding to voluntarily consent and that the Defendant's silence did not amount to an objection to the searches. The Government additionally asserts that the Defendant was properly detained in the parking lot based upon reasonable suspicion that he was involved in the recent bank robbery.

The Defendant claims the searches of the Nissan Sentra and the Defendant's apartment were invalid because Ms. Lasley did not give valid consent. The Fourth Amendment protects against unreasonable searches. U.S. Const. amend. IV. A search is not unreasonable "if a person with a

privacy interest" consents to the search. United States v. Ivy, 165 F.3d 397, 402 (6th Cir. 1998). The government bears the burden of proving the validity of consent by producing "clear and positive" evidence that it was given freely and voluntarily. Id.; see also Bumper v. North Carolina, 391 U.S. 543, 549 (1968). The Court considers the totality of the circumstances in making this determination. United States v. Ward, 400 Fed. App'x 991, 996 (6th Cir. 2010). The totality of the circumstances may include "the age, intelligence, and education of the individual; whether the individual understands the right to refuse consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police. Id. (quoting United States v. Riascos-Suarez, 73 F.3d 616, 625 (6th Cir. 1996)). Mere submission to authority does not amount to freely and voluntarily given consent. Florida v. Royer, 460 U.S. 491, 497 (1983). Consent is invalid if coerced, that is, given in "submission to authority rather than as an understanding and intentional waiver." United States v. Jones, 641 F.2d 425, 429 (6th Cir. 1981); see also United States v. Richard, 994 F.2d 244, 251 (5th Cir. 1993).

### (1) Consent to Search the Nissan Sentra

The Defendant argues that he had a reasonable expectation of privacy in the Nissan Sentra. The Defendant challenges Ms. Lasley's consent to search the Nissan Sentra as invalid in light of Randolph v. Georgia, 547 U.S. 103 (2006). The Government contends the officers received valid consent from the owner of the Nissan Sentra.

### (a) Defendant's Expectation of Privacy in the Nissan Sentra

The Defendant first argues that he had a reasonable expectation of privacy in the Nissan Sentra. A person seeking to challenge the search of property does not have to have a property interest in the property searched. Katz v. United States, 389 U.S. 347, 353 (1967). Instead, in order

47

to challenge the validity of a search, a defendant must have a "reasonable expectation of privacy" in the area searched. Rakas v. Illinois, 439 U.S. 128, 143 (1978). The Sixth Circuit applies a two-part test to determine whether a person has a legitimate expectation of privacy in a location. United States v. Waller, 426 F.3d 838, 844 (6th Cir. 2005). The Court first considers "whether the individual, by conduct, has exhibited an actual expectation of privacy" and whether this expectation is a reasonable one. Id. (quoting United States v. King, 227 F.3d 732, 743 (6th Cir. 2000)) (other citations omitted). In analyzing whether the Defendant had a legitimate expectation of privacy, the Court should consider:

> [T]he person's proprietary or possessory interest in the place to be searched or item to be seized; whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.

Id. (quoting King, 227 F.3d at 744).

The Court finds that the Defendant had a legitimate expectation of privacy in the Nissan Sentra. First, Ms. Lasley stated that even though the vehicle was registered in her name, she shared the vehicle with the Defendant. Ms. Lasley gave the Defendant permission to use the vehicle. Second, the officers saw the Defendant drive the vehicle from Food City to Meadowood Apartments. Finally, the Defendant had the keys to the vehicle. Based upon these circumstances, the Court finds that the Defendant had a reasonable expectation of privacy in the Nissan Sentra. See United States v. Smith, 263 F.3d 571, 586-87 (6th Cir. 2001) (finding that the driver of a rental car had a legitimate expectation of privacy because he was driving with permission, his wife had paid to rent the car, and could exclude others from driving it).

*(b) Ms. Lasley's Consent to Search the Nissan Sentra was Voluntarily*

48

The Government contends that Ms. Lasley's consent was voluntary. Ms. Lasley told the officers that the Nissan Sentra was registered in her name. Bukowski explained the concept of consent to Ms. Lasley. Bukowski first asked for Ms. Lasely's verbal consent to search the Nissan Sentra. After receiving verbal consent, Bukowski then retrieved a Consent to Search form. He filled out the information on the form and then went over the form with Ms. Lasley. He explained that any consent given must be voluntary and she had the right to refuse consent. Ms. Lasley read the form to herself. She then signed this form. The form included the provisions "I have been advised of my right to refuse consent" and "I give this permission voluntarily." Ms. Lasley testified that she understood the form. Furthermore, Bukowski and Gilreath's testimony indicate that Ms. Lasley did not appear nervous or hesitant and was cooperative throughout the process. Bukowski did not raise his voice at any time. Ms. Lasley was present during the search of the Nissan Sentra and did not object to the search.

Ms. Lasley is a twenty-four year old woman who completed high school and has some college education. As such, she is capable to read and understand a consent form, particularly one which has been read to her. Only two law enforcement officers were present inside her apartment at the time Ms. Lasley signed the consent form, and the Court has no evidence that the officers intimidated or coerced her into signing the consent form. In signing a consent form, Ms. Lasley did more than merely submit to authority. She knowingly and voluntarily gave consent with the understanding that she had the right to refuse. Therefore, Ms. Lasley's consent to search the Nissan Sentra was voluntary.

*(c) Defendant Never Negated Ms. Lasley's Consent*

The Defendant contends that the officers prevented him from returning to his apartment in

49

order to gain Ms. Lasley's consent to search the Nissan Sentra. Generally, the Supreme Court in Georgia v. Randolph held that when "a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search." Georgia v. Randolph, 547 U.S. 103, 121 (2006). The Court questions whether the Randolph analysis could be applied to the present facts, as the Defendant suggests, because Randolph involved a dwelling, not a vehicle. Id. It is well-established that vehicles have a lesser expectation of privacy than residences. United States v. Smith, 510 F.3d 641, 651 (6th Cir. 2007).

However, even if Randolph could be applied to the consent to search the vehicle, the Defendant made no express objections to the search of the Nissan Sentra. When Boatman asked the Defendant if he had the keys to the Nissan Sentra, the Defendant replied that he did not. Boatman told the Defendant that he knew that the Defendant had the keys on a lanyard around his neck. The Defendant then dropped the keys to the ground. The Defendant did not tell Boatman he objected to the search of the car, nor does the Court take the Defendant's actions to be an objection to the search of the vehicle. Instead, the actions suggest that the Defendant acquiesced in the search of the Nissan Sentra.

*(d) Probable Cause to Search the Nissan Sentra*

Alternatively, the Court finds the officers had probable cause to search the Nissan Sentra. Even if the Defendant's actions constituted an objection, the officers had probable cause to search the Nissan Sentra. It is well-established that searches of vehicles pursuant to probable cause are an exception to the general warrant requirement. United States v. Smith, 510 F.3d 641, 647 (6th Cir. 2007). The automobile exception allows officer to search a vehicle without a warrant if there is "probable cause to believe that the vehicle contains evidence of a crime." United States v. Lumpkin,

50

159 F.3d 983, 986 (6th Cir. 1998). Probable cause is defined as "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause existed at the time of the search should be determined by looking at the totality of the circumstances. Smith, 510 F.3d at 648.

The Court finds that the officers had probable cause to search the Nissan Sentra for evidence of the bank robbery. First, the vehicle Gilreath observed the Defendant driving in the Food City parking lot matched the description of the vehicle obtained from witnesses to the robbery and a photograph of the getaway car from the Food City parking lot surveillance camera. Although the license plate number of the getaway vehicle did not match exactly, Gilreath knew from experience that bank robbers usually changed the license plates. Second, Gilreath interviewed witnesses who told him that the red dye pack exploded and the robber placed the bag in the trunk of the vehicle. Third, when Bukowski showed the picture of the getaway car to Ms. Lasley, Ms. Lasley stated that it looked like her vehicle. Fourth, the officers saw the Defendant driving the Nissan Sentra in close proximity to where the bank robberies occurred. Fifth, the Defendant matched the robber's description in height, weight, and body build. Sixth, Ms. Lasley told Bukowski and Gilreath that she and the Defendant recently cleaned the Nissan Sentra. Finally, the Defendant informed the officers that he had previously been arrested for a bank robbery in Boston. Therefore, taken together, these facts constituted probable cause that evidence from the bank robberies could be found in the Nissan Sentra.

### (2) Consent to Search the Apartment

The Defendant challenges Ms. Lasley's consent to search the apartment on two fronts: First, he argues that Ms. Lasley's consent is invalid because she lacked the authority to consent. Second,

51

the Defendant contends that Ms. Lasley's consent was involuntary.

*(a) Authority to Consent*

A third party who "possess common authority over the premises" may provide consent to search the premises. United States v. Grayer, 232 F. App'x 446, 448 (6th Cir. 2007). Common authority is implied from "'mutual use . . . by persons generally having joint access or control for most purposes.'" Id. at 449 (quoting United States v. Matlock, 415 U.S. 164, 172 n.7 (1974)) (other citations omitted). Common authority does not depend on property rights. United States v. Penney, 576 F.3d 297, 307 (6th Cir. 2009). In fact, the Sixth Circuit has "confirmed a number of times that a live-in girlfriend has common authority over the premises wherein she cohabits with a boyfriend." Id. at 308 (citing Grayer, 232 F. App'x at 449; United States v. Hudson, 405 F.3d 425, 442 (6th Cir. 2005); United States v. Gillis, 358 F.3d 386, 391 (6th Cir. 2004); United States v. Moore, 917 F.2d 215, 223 (6th Cir. 1990)).

After the search of the Nissan Sentra, Bukowski, Gilreath, and Ms. Lasley returned to the apartment. Bukowski asked Ms. Lasley for consent to search the apartment for evidence of the bank robbery. Bukowski explained that the consent form to search the apartment was the same consent form, which he had explained and she had signed for the search of the Nissan Sentra.

The Meadowood apartment manager told Bukowski that although only the Defendant's name was on the lease, Ms. Lasley lived there and dropped off the rent payment. When he asked for consent to search the apartment, Bukowski asked Ms. Lasley a series of questions regarding Ms. Lasley's living arrangements. Ms. Lasley indicated that she had keys to the apartment, free access to the whole apartment, went from the apartment as she pleased, she slept and kept her things only at the apartment, and received mail at that address. Ms. Lasley also indicated that she and the

52

Defendant shared the same bedroom in the apartment. Therefore, the Court finds that Ms. Lasley mutually used and had control over the apartment, which gave her the authority to consent to a search of the premises.

The Defendant argues that even if Ms. Lasley had authority to consent, her consent was invalid because the officers detained the Defendant away from the apartment for the sole purpose to prevent his objection to the search. [Docs. 16, 24]. The Defendant asserts that the officers knew that he objected to the search and detained him in the parking lot even though the Defendant asked to go to his apartment. The Government contends [Docs. 20, 25] that the silence of one co-tenant does not amount to a refusal, given the consent of another co-tenant. It asserts that the Defendant must expressly object to the search. The Government additionally argues that the officers did not purposefully prevent the Defendant from returning to his apartment to prevent his objection.

When "a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search." Georgia v. Randolph, 547 U.S. 103, 121 (2006). However, a "potential objector, nearby but not invited to take part in the threshold colloquy, loses out." Id. Any objection to a search must be expressly made. See United States v. Ayoub, 498 F.3d 532, 540 (6th Cir. 2007). Simply remaining silent and neither consenting nor expressly refusing consent does not operate as a refusal of consent. See United States v. Stanley, 351 F. App'x 69, 72 (6th Cir. 2009). The Supreme Court in Randolph noted the necessity of formalistic line-drawing when examining issues of consent to search with multiple tenants. Randolph, 547 U.S. at 121. An objection of a tenant not physically present may nevertheless be a valid objection when there is "evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." Id. However, police may remove such a potentially

53

objecting tenant for a legitimate purpose. See id.

The Court first examines whether Defendant was legitimately detained at the time Ms. Lasley gave consent.

Officers Bukowski, Hughes, Anderson, and Boatman intercepted the Defendant as he walked from the area of the mailboxes through the parking lot toward his apartment. The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend. IV. Not every contact between a police officer and a member of the public is a seizure. United States v. Winfrey, 915 F.2d 212, 216 (6th Cir. 1990). "The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens:

> (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or Terry stop which must be predicated upon "reasonable suspicion;" and (3) arrests which must be based upon "probable cause."

United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008). A police-citizen encounter does not implicate the Fourth Amendment until some coercive or intimidating behavior occurs causing the defendant reasonably to believe that compliance is compelled. United States v. Collis, 766 F.2d 219, 221 (6th Cir. 1985). Nor is there any Fourth Amendment implication before a defendant is stopped or searched. United States v. Saucedo, 226 F.3d 782, 789 (6th Cir. 2000).

The test for when the individual has been seized is whether a reasonable person in those circumstances would have felt he or she was not free to leave. Michigan v. Chesternut, 486 U.S. 567, 573 (1988); United States v. Smith, 594 F.3d 530, 536 (6th Cir. 2010); United States v. Cooke, 915 F.2d 250, 252 (6th Cir. 1990). As noted above, "[a]bsent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled," an officer's request for identification or information is not a seizure. Collis, 766 F.2d at 221 (holding that an officer's

54

request that defendant accompany him to the baggage claim area to retrieve a driver's license was

not a seizure). The Supreme Court has enumerated certain factors that can indicate a seizure:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

United States v. Mendenhall, 446 U.S. 544, 554 (1980); Smith, 594 F.3d at 536.

In this case, the Court finds that the Defendant was seized when the law enforcement officers

told the Defendant he was not free to leave. When the agents first approached the Defendant near

the tennis courts, Hughes showed the Defendant his credentials and stated the agents were

investigating a bank robbery. The Defendant stopped and talked to the agents. At this point, the

encounter was not a seizure. After telling the agents that he did not trust the FBI, the Defendant

stated that he no longer wanted to speak without an attorney present. No further questions regarding

the robbery were asked. When the Defendant then asked if he was free to leave and was told he was

not, the encounter became a seizure. From that point forward, the Court finds that the Defendant was

in the presence of several officers and was confined to a limited space. Moreover, the Defendant was

expressly told he could not leave. Accordingly, the Court has no hesitation in finding that the

Defendant was seized, and the Fourth Amendment was implicated at that point.

The Court must next determine whether the seizure of the Defendant was a permissible one:

Whether the officers had either reasonable suspicion or probable cause to detain the Defendant, and

whether the Defendant was the subject of an investigatory detention or was under arrest at the

moment he was seized. The Defendant argues that at the time he was seized, the officers lacked both

probable cause to arrest him and reasonable suspicion to conduct an investigatory stop. The

55

Government contends that the officers properly conducted an investigatory detention of the Defendant based upon the specific and articulable facts they possessed at the time.

Assessing whether an investigatory stop comported with the Fourth Amendment is a two step process: First, the Court must determine whether the officer had a reasonable basis for the stop by looking to whether the officer had reasonable suspicion supported by specific and articulable facts. United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006). Second, if the stop was proper at its inception, the Court must examine whether the intrusiveness of the stop was reasonably related to the situation by reviewing the reasonableness of the officer's actions in the context of the presenting circumstances. Id. The Court will first determine whether the officers had reasonable suspicion to conduct an investigatory stop of the Defendant. The Court will then turn to whether the encounter exceeded the bounds of an investigatory stop and was actually an arrest, as the Defendant argues.

A police officer may briefly detain an individual on less than probable cause: "[A] brief investigative stop, or Terry stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (other citations omitted). Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. Martin, 289 F.3d at 396. If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. Id. at 397. The Court assesses the reasonableness of the officer's suspicion in light of the totality of the circumstances surrounding the stop. See United States v. Arvizu, 534 U.S. 266, 273

56

(2002); <u>Martin</u>, 289 F.3d at 398. Although an officer may not rely upon a mere hunch to support a

<u>Terry</u> stop, "the likelihood of criminal activity need not rise to the level required for probable cause,

and it falls considerably short of satisfying a preponderance of the evidence standard." <u>Arvizu</u>, 534

U.S. at 274.

In this case, the Courts finds that the officers had reasonable suspicion to stop and detain the

Defendant. The Defendant matched the general physical description of the bank robber and was

moving suspiciously in the parking lot, as if attempting to conduct counter-surveillance on the

officers. Furthermore, the car driven by the Defendant matched the photograph of the getaway car

obtained from the Food City surveillance camera, including the taillights and hubcaps. In addition,

the Nissan dealership employee stated that the vehicle in the Food City surveillance picture was a

Nissan Sentra between the years of 2001 and 2004, which also matched the vehicle the Defendant

was driving. The Defendant and the Nissan Sentra were first spotted at the Food City, which was

where the robber had parked during the Enrichment Federal Credit Union robbery. Finally, the

Defendant told the officers that he had been convicted of bank robbery in the past. All of these facts

and circumstances gave the officers reasonable suspicion to believe that the Defendant could be the

perpetrator of the February 1 robbery. Additionally, knowing that a firearm was used at the bank

robbery in question caused the officers to have legitimate safety concerns about allowing Defendant

to return to his apartment to question him. Under the totality of the circumstances, the officers were

justified in stopping and detaining the Defendant.

The Court also finds that the officers did not purposefully prevent the Defendant from

objecting to the search. In order to determine whether a detention exceeded the boundaries of a valid

investigative stop, the Court should "'examine whether the police diligently pursued a means of

investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" Hoover v. Walsh, 682 F.3d 481, 497 (6th Cir. 2012) (quoting United States v. Sharpe, 470 U.S. 675, 686 (1985)). The Court should apply the totality of the circumstance test in determining whether an investigatory detention exceeded the length of time necessary for the officer to conduct his or her investigation. Id. at 498 (upholding a prolonged detention where the officers spoke to the defendant, communicated with one another, requested the presence of a supervisor, and made contact with the defendant's wife).

During the length of Defendant's detention, the officers were still attempting to confirm or dispel their suspicions regarding the Defendant's involvement in the robbery. After seeing his fellow officers approach the Defendant and that the Defendant did not attempt to flee, Bukowski immediately went to the Defendant's apartment. Bukowski had no contact with the Defendant. Gilreath, who was in his vehicle when the officers approached the Defendant, immediately went to the Defendant's apartment to meet Bukowski.

Anderson and Hughes informed the Defendant that they were investigating a bank robbery. The Defendant told the agents that he had previously been arrested for a bank robbery "up north" and did not trust the FBI. [Doc. 23 at 173-74]. The Defendant's admission that he had previously been arrested for a bank robbery in Boston did not dispel the officer's suspicions. The Defendant then stated that he would not speak without an attorney and asked if he was free to leave. Hughes replied that he was not. Agent Hughes testified that it was approximately twenty minutes between the time when he told the Defendant he was not free to leave and when the Defendant was formally arrested after the search of the vehicle revealed evidence of the bank robberies. Although the officers did not question the Defendant, during this twenty minute period, Bukowski and Gilreath were pursuing

58

their investigation of the Defendant by talking with Ms. Lasley. Ms. Lasley told Bukowski and Gilreath that the picture from the Food City surveillance camera looked like her Nissan Sentra and that the vehicle had recently been cleaned. This information served to confirm, rather than dispel, the agents' suspicions. The agents then searched the Nissan Sentra and found evidence of the bank robberies inside. Thus, the agents were investigating their suspicions of the Defendant's involvement in the bank robbery during the duration of the time he was detained.

In addition, Hughes wanted to prevent the Defendant from returning to his apartment to ensure the safety of the officers there questioning Ms. Lasley. Hughes knew that a firearm had been used in the recent bank robberies. Detention of a suspect during a Terry investigation in a way that protects officer safety does not transform the Terry stop into an arrest. See United States v. Bradshaw, 102 F.3d 204, 211-12 (6th Cir. 1996) (holding that detaining the defendant in a police car for officer safety did not transform a traffic stop into an arrest). Therefore, the officers did not detain and remove the Defendant for the purpose of preventing him from refusing consent to a search.

The Court finds that the Defendant was properly detained based on reasonable suspicion prior to the point at which he was placed under arrest. Therefore, because it cannot be demonstrated that law enforcement improperly detained the Defendant to prevent his objection, the Defendant "loses out" on any potential objection to the searches. Randolph, 547 U.S. at 121. The Defendant was not physically present at the time his girlfriend consented to the searches. He was "nearby, but not invited to take part in the threshold colloquy." Id. The Defendant made no express objection to the search while he was detained in the nearby parking lot. Each officer and agent testified that they had not heard the Defendant object to either the search of the car or the apartment. Finally, Hughes testified that there were legitimate safety concerns regarding the Defendant. The Court finds that

59

the Defendant's detention did not negate Ms. Lasley's consent to search the apartment.

*(b) Voluntariness of Consent*

The Defendant also argues that Ms. Lasley acquiesced to the officers' request to search the apartment, rather than giving valid consent. [Docs. 16, 24]. After the agents searched the Nissan Sentra, Bukowski asked Ms. Lasley if she would give consent to search the apartment. Ms. Lasley asked Bukowski if she could give consent to search the apartment because her name was not on the lease. Bukowski proceeded to ask her a series of questions regarding Ms. Lasley's living arrangements. Ms. Lasley then gave oral consent to search the apartment and signed a Consent to Search form. Bukowski testified that he did not explain this consent form in detail because he had previously explained the concept of consent with the vehicle search.

The Court finds that Ms. Lasley's consent to search the apartment was voluntarily given. The fact that Ms. Lasley asked about whether she had the authority to consent does not render her consent involuntary. Moreover, Ms. Lasley's testimony that she felt as though she had to sign the consent form is not credible. Both Gilreath and Bukowski testified that they did not raise their voice to Ms. Lasley. In addition, Ms. Lasley's demeanor was pleasant and calm during the search. Ms. Lasley testified that she told the agents that she understood the Consent to Search form and she was given ample opportunity to read the form. In fact, Ms. Lasley testified that there was nothing confusing about the consent she gave to search the apartment and she was aware that she had the right to refuse.

As mentioned above, Ms. Lasley is a twenty-four year old woman who completed high school and has some college education. In signing the consent form to search the apartment, she knowingly and voluntarily gave consent. Therefore, Ms. Lasley's consent to search the apartment was valid.

60

In sum, the Court recommends that the evidence discovered as the result of the searches of both the Nissan Sentra and the apartment be deemed admissible for purposes of trial. The Defendant's Fourth Amendment rights were not violated, because Ms. Lasley's consent was knowingly and voluntarily given for each search.

### (B) February 7, 2012 Search of Gary Lopez's Garage

The Defendant contends that his Fourth Amendment rights were violated when the officers searched the boxes in Mr. Lopez's garage. [Docs. 15, 24]. The Defendant asserts that by his conduct, he exhibited an actual expectation of privacy in the boxes. Further, the Defendant asserts that his expectation of privacy in the boxes stored in Mr. Lopez's garage was reasonable. Finally, the Defendant contends that Mr. Lopez did not have the authority to consent to the search of the Defendant's boxes. The Government asserts that the Defendant's Fourth Amendment rights were not violated when the officers searched the boxes in Mr. Lopez's garage. [Docs. 19, 25]. The Government argues that the Defendant had no reasonable expectation of privacy in the boxes stored in Mr. Lopez's garage. The Government additionally contends that Mr. Lopez had apparent authority to give consent to search.

### (1) The Defendant's Expectation of Privacy

"A person has a constitutionally protected reasonable expectation of privacy." United States v. Katz, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). The Sixth Circuit applies a two-part test to determine whether a person has a legitimate expectation of privacy. United States v. Waller, 426 F.3d 838, 844 (6th Cir. 2005). First, the Court considers "whether the individual, by conduct, has exhibited an actual expectation of privacy." Id. (quoting United States v. King, 227 F.3d 732, 743 (6th Cir. 2000)) (other citations omitted). Second, the Court considers whether the expectation of

privacy is a reasonable one. Id. In analyzing whether the Defendant had a legitimate expectation of privacy, the Court should consider:

> [T]he person's proprietary or possessory interest in the place to be searched or item to be seized; whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.

Id. (quoting King, 227 F.3d at 744). In addition, "A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home." United States v. Karo, 468 U.S. 705, 725 (1984) (O'Connor, J., concurring); see also United States v. Cork, 18 F. App'x 376, 383 (6th Cir. 2001). Here, the Court finds that the Defendant did have a legitimate expectation of privacy in the boxes in his father's garage. First, the Defendant had a possessory interest in the boxes because they belonged to him. Second, the Defendant took normal precautions to maintain his privacy in the contents of the boxes. The Defendant's boxes were closed with a lid and he stored them in Mr. Lopez's garage. Third, the Defendant exhibited a subjective expectation that the area would remain free from governmental intrusion because he had previously stored his belongings in the garage without government intrusion. Fourth, the Defendant was legitimately on the premises because he had his father's permission to store his items in the garage. Although the Defendant did not have the right to exclude others from Mr. Lopez's garage, the King factors weigh in favor of the Defendant.

The Sixth Circuit has analyzed two cases that provide the Court guidance on the Defendant's expectation of privacy in the boxes stored in Mr. Lopez's garage. In United States v. Cork, the court upheld a warrantless search of the defendant's shoebox found underneath a bed because the Defendant "did not manifest any expectation of privacy" in the shoebox. 18 F. App'x at 384. After

receiving an anonymous tip that the defendant was involved in a bank robbery, several officers went to the defendant's aunt's home, where defendant was staying at the time. Id. at 378-79. The aunt gave the officers consent to enter and search the home. Id. at 379. The aunt informed the officers that her sixteen-year-old son and the defendant shared a room. Id. The aunt remained present during the search. Id. The officers asked if they could search the son's bedroom, and the aunt agreed. Id. The bedroom door was open and unlocked. Id. The officers found several shoeboxes under the son's bed. Id. The officers opened a shoebox and found evidence of the bank robbery inside. Id. The court upheld the search because the defendant did not have an expectation of privacy in the shoeboxes, thus giving the aunt the authority to consent to the search. Id. at 384. The court reasoned that the shoebox was not "seal[ed], tape[d], or lock[ed]." Id. at 383. The shoebox was not marked to demonstrate it was the defendant's property "or that the contents were private." Id. In addition, the shoebox was not concealed because it was stored "next to other shoeboxes in a common area under the bed." Id. at 383-84. Therefore, the court upheld the search. Id. at 384.

Conversely, in United States v. Taylor, the court held that a warrantless search of the defendant's shoebox found in a spare bedroom was invalid because the defendant had a reasonable expectation of privacy in the shoebox. 600 F.3d 678, 685 (6th Cir. 2010). The officers, who had an arrest warrant for the defendant, received information indicating that the defendant was a resident in an specific apartment. Id. at 679. The officers arrived at the apartment where the defendant was allegedly staying, and the permanent tenant gave the officers permission to search for the defendant inside the apartment. Id. The officers found the defendant in a spare bedroom and arrested him. Id. After the arrest, the officers asked the permanent tenant if they could search the apartment. Id. The officers did not ask for permission to search the defendant's belongings. Id. The permanent tenant

consented to the search. Id. The officers returned to the room where they had arrested defendant. Id. They searched a closet that was filled with men's clothes, children's clothes, and toys. Id. On the floor of the closet, in the corner, the officers found a closed Nike shoebox. Id. The box was partially covered by a piece of men's clothing. Id. at 679-80. The officers opened the shoebox and found incriminating evidence inside. Id. The permanent tenant later told the officers that the defendant did not live there but stored some of his items in the spare bedroom. Id. at 680. The defendant initially paid the tenant for storage. Id. The court invalidated the warrantless search of defendant's shoebox. Id. at 685. The court reasoned that the defendant "took precautions to manifest his expectations of privacy by closing the shoebox, putting it in the corner of the closet in a little-used room, partially covering it with an item of his clothing, and not granting [the permanent tenant] permission to look inside." Id. at 683.

The facts of the instant case appear to be more similar to those in Taylor than those in Cork. The Defendant's boxes were closed with a lid and stored in his father's garage. The officers knew that the Defendant did not live with his father. Although the boxes were not concealed, they sat on a high shelf. Mr. Lopez testified that he did not feel free to look inside the boxes. Therefore, the Defendant had a legitimate expectation of privacy in the boxes stored in his father's garage.

*(2) Mr. Lopez's Consent to Search the Defendant's Boxes*

The Defendant argues that Mr. Lopez did not have the authority to consent to the search of Defendant's boxes. [Doc. 26]. The Government argues that Mr. Lopez had both actual and apparent authority to consent to a search of the Defendant's boxes located in the garage. [Doc. 25].

*(a) Actual Authority*

In the absence of proof that a defendant consented to the search, the government "'may show

64

that permission to search was obtained from a third party who possessed common authority over or other sufficient relationships to the premises or effects sought to be inspected.'" Waller, 426 F.3d at 845 (quoting United States v. Matlock, 415 U.S. 164, 171-72 (1974)). "[C]ommon authority rests on 'mutual use of the property by persons generally having joint access or control for most purposes.'" Id. (quoting Matlock, 415 U.S. at 171-72). The Court considers whether it is "reasonable to recognize" that a co-inhabitant "has a right to permit the inspection" and "others have assumed the risk" that a co-inhabitant may permit an inspection. Id. (quoting Matlock, 415 U.S. at 171-72). Generally, "mature family members possess the authority to admit police to look about the family residence" unless the "family member targeted for the search has clearly manifested an expectation of exclusivity." United States v. Clutter, 914 F.2d 775, 777-78 (6th Cir. 1990). However, the Court recognizes that "a resident's consent to search his home is not necessarily consent to search a closed object within the home." Waller, 426 F.3d at 845. Finally, it is the government's burden to prove common authority. Rodriguez, 497 U.S. at 181.

The Sixth Circuit has held that a tenant's consent to search his apartment did not permit officer's to search the defendant's suitcase stored with the tenant's permission in a closet. Waller, F.3d at 845-46. The Court stated:

> The parties held a mutual understanding that the luggage contained Waller's private personal effects. Waller never gave [the tenant] permission to open the luggage bag and Howard never did so. The luggage contained not only firearms but also personal toiletries used by Waller, who showered in the apartment. On these facts, we conclude that [the tenant] did not have *mutual use* of the luggage, nor did he have joint access and control *for most purposes*.

Id. (emphasis in original).

In this case, the Government has not established that Mr. Lopez had actual authority to

65

consent to the search of the Defendant's boxes. The Court has already found that the Defendant had a legitimate privacy interest in the boxes stored in his father's garage. The Defendant did not live with Mr. Lopez, but the Defendant commonly stored his belongings in the garage and the boxes were closed with lids. The way in which the boxes were stored indicates that the Defendant "clearly manifested an expectation of exclusivity." Clutter, 914 F.2d at 778. Mr. Lopez testified that he has not felt free to look in the Defendant's belongings since the Defendant was a teenager. In addition, there is no evidence that indicates Mr. Lopez "mutually used" the contents found in the boxes. In fact, Mr. Lopez believed that the boxes contained audio equipment. Therefore, Mr. Lopez did not have actual authority to consent to the search of the Defendant's boxes.

### (b) Apparent Authority

Even if the person who consented does not have actual authority to consent to the search, the search will be upheld if the officer reasonably believes the third party had authority to consent. Rodriguez, 497 U.S. at 186. Specifically, the apparent authority doctrine provides that if "one person consents to a search of property owned by another, the consent is valid if 'the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting party had authority.'" Waller, 426 F.3d at 846 (quoting United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996)) (other citations omitted). In assessing apparent authority, the Court should consider "all of the surrounding circumstances." Id. Moreover, when the authority of the consenting individual is ambiguous, officers must make further inquiry to determine whether authority to consent exists. Id. (citing Rodriguez, 497 U.S. at 188-89).

In this case, although Mr. Lopez did not have actual authority to consent to the search of the boxes, the officers reasonablely believed that Mr. Lopez did have such authority. Bukowski asked

Mr. Lopez if he would consent to a search of his home and explained that the officers were searching for evidence of the bank robbery. Mr. Lopez stated that the agents could search his garage but not his main residence because the Defendant "didn't come to the main residence without [Mr. Lopez] being there." [Doc. 23 at 87]. Mr. Lopez informed the agents that a few days earlier, the Defendant brought boxes over to store in the garage. Mr. Lopez told the agents that he was also storing family friends' belongings and that the agents were not allowed to search these items. Mr. Lopez accompanied the officers to the garage and remained there during the search. When an agent picked up an item belonging to the family friends, Mr. Lopez objected to the search of that particular item. The agents abided by Mr. Lopez's request. When the agents searched through the Defendant's boxes, Mr. Lopez did not object. Mr. Lopez even pointed out the Defendant's boxes to let the agents know that those specific boxes belonged to the Defendant.

Although Mr. Lopez claims that he briefly left the garage during the search and when he returned, the agents were going through the Defendant's boxes and that he did not give consent to search the Defendant's boxes, Mr. Lopez's testimony is not credible on these points. Four officers testified that Mr. Lopez remained in the garage during the search of the Defendant's boxes and did not object to the search of the Defendant's boxes. Further, Mr. Lopez's consent to search only the garage because the Defendant "didn't come to the main residence without [Mr. Lopez] being there" [Doc. 23 at 87], indicates that Mr. Lopez consented to the agent's search of the Defendant's boxes. Mr. Lopez objected to the officers searching the family friends' belongings, which indicates Mr. Lopez would have verbally objected if he did not want the agents searching through the Defendant's boxes. Finally, the agents told Mr. Lopez that they were searching "for the gun and the bank robbery loot." [Doc. 23 at 86]. Mr. Lopez was aware that the officers would be looking for these items among

67

the Defendant's belongings. Although Mr. Lopez testified that he had not felt free to look into the Defendant's belongings since the Defendant was a teenager, Mr. Lopez did not inform the agents that he had always respected the Defendant's privacy. The Court finds that Mr. Lopez's actions at the time of the search caused the officers to believe that he had apparent authority to consent to the search of the Defendant's boxes.

In sum, the Court recommends that the evidence discovered as the result of the searches of Mr. Lopez's garage and the Defendant's boxes therein be deemed admissible for purposes of trial because even though the Defendant had a legitimate expectation of privacy in the boxes stored in his father's garage, the searching officers reasonably believed that Mr. Lopez had authority to consent to the search.

### *(C) The Good Faith Exception*

Although the Court has already found that all three searches comported with the Fourth Amendment, the Court will briefly address the Government's final argument that the good faith exception is applicable to any Fourth Amendment violation in the instant case. It argues that the officers reasonably relied on Ashley Lasley's consent to search the Nissan Sentra and the apartment and upon George Lopez's consent to search the Defendant's boxes in his garage. Moreover, it maintains that the officers acted with restraint and with every intent to abide by the law when they stopped searching and obtained a federal search warrant before opening the lockbox contained in the Defendant's box in his father's garage. The Government contends that based upon the great cost to society from letting a violent, armed bank robber go free, the Court should not apply the exclusionary rule in this case.

Not every Fourth Amendment violation results in the exclusion of the evidence obtained.

68

See Herring v. United States, 129 S. Ct. 695, 700 (2009).  Exclusion of evidence is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" Id. at 699 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)).  The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," Arizona v. Evans, 514 U.S. 1, 11 (1995), and where it "results in appreciable deterrence." Herring, 129 S. Ct. at 700 (quoting United States v. Leon, 468 U.S. 897, 909 (1984)) (internal quotation marks omitted). "[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs." Herring, 129 S. Ct. at 700 (quoting Illinois v. Krull, 480 U.S. 340, 352-53 (1987)).  In the end, the decision to suppress evidence "turns on the culpability of the police and the potential for exclusion to deter wrongful police conduct." Id. at 698.

Thus, the courts have recognized that certain Fourth Amendment violations do not involve law enforcement officers' own misconduct and that excluding evidence in those cases would not deter wrongful police conduct.  As such, a number of "good faith" exceptions to the exclusionary rule have developed.  These include (1) reliance on a search warrant that is later found to be unsupported by probable cause, Leon, 468 U.S. at 922; (2) reliance on a search warrant that contains clerical errors, Massachusetts v. Sheppard, 468 U.S. 981, 991 (1984); (3) reliance on a statute with a constitutional defect that was not "sufficiently obvious," Krull, 480 U.S. at 349-50; (4) reliance on mistaken data or information from a judicial employee, Evans, 514 U.S. at 15; see also Herring, 129 S. Ct. at 701; and (5) reasonable reliance on "on a United States Court of Appeals' well-settled precedent prior to a change of that law," United States v. Buford, 632 F.3d 264, 276 (6th Cir. 2011). The instant warrantless searches of the Nissan Sentra, the Defendant's apartment, and the

69

Defendant's boxes in his father's garage fall within none of these good faith exceptions. Accordingly, the Court finds that the "good faith" analysis does not apply in this case.


## V. CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant legal authorities, the Court finds no basis to suppress the evidence obtained from the searches of the Nissan Sentra, the Defendant's apartment, or the box in Gary Lopez's garage. For the reasons set forth herein, it is **RECOMMENDED** that the Motion to Suppress as Evidence the Contents of a Box Seized and Searched on February 7, 2012 **[Doc. 15]** and the Motion to Suppress All Evidence Obtained as a Result of the Search of the Defendant's Residence and a Black 2003 Nissan Sentra on February 3, 2012 **[Doc. 16]** be **DENIED**.[1]

Respectfully submitted,

_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[1]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).